**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **ANUP PARMAR,** | |
| **PLAINTIFF,** | **Case No.: 1:19-cv-00387** |
| **v.** | **Judge: Rebecca R. Pallmeyer** |
| **CREDIT CONTROL, LLC** | |
| **DEFENDANT.** | |

## DEFENDANT, CREDIT CONTROL, LLC MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant, Credit Control, LLC ("Credit Control") by and through its undersigned counsel, submits this Memorandum of Law in support of its Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c).

## I. INTRODUCTION

### A. Preliminary Statement

The Court should grant Credit Control's Motion for Judgment on the Pleadings as to Counts I, II, and III of Plaintiff's insufficiently plead First Amended Complaint ("Complaint"). (DE 11). Count I of Plaintiff's Complaint alleges violations of the Fair Debt Collection Practices Act, but Plaintiff has failed to sufficiently plead that Credit Control was acting as a debt collector as defined by the Act.

As to Count II, alleging a violation of the Telephone Consumer Protection Act ("TCPA"), Plaintiff has failed to allege sufficient facts to make it plausible that Credit Control used an automatic telephone dialing system ("ATDS"), as that term is defined in the TCPA, to place the phone calls to Plaintiff. Under the TCPA, calls made with telephony equipment that has the present

1

capacity to generate and dial random or sequential telephone numbers are generally prohibited. 47 U.S.C. § 227(a)(1), (b)(1)(A)(iii). What the TCPA does not prohibit, however, is the use of technology that merely has the capacity to perform the specific function of "predictive dialing" (using algorithms to dial telephone numbers and to help predict when a live agent will be free to take the next call and speak with the consumer).

Plaintiff's Complaint is completely devoid of allegations that could reasonably conclude that Credit Control employed the use of an ATDS, as he does not plead any facts suggesting that Credit Control's dialing equipment could automatically generate and dial random or sequential numbers—the only relevant issue in this Court's statutory analysis. Other judges in this District have granted judgment on the pleadings where the plaintiff alleged the use of a predictive dialer, but did not plead any facts to suggest that the equipment had the capacity to generate telephone numbers, either randomly or sequentially, and then dial those numbers, and other courts have followed this analysis. See *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927 (N.D. Ill. 2018) (Feinerman, J.) See also, *Bader v. Navient Solutions, LLC*, 2019 U.S. Dist. LEXIS 100396 (N.D.Ill June 14, 2019). The allegations in Plaintiff's Complaint are, in all relevant respects, identical to the plaintiff's allegations in *Pinkus* because Plaintiff has failed to sufficiently or plausibly plead facts to support, or even suggest, that the equipment used by Credit Control to contact Plaintiff has the capacity to generate telephone numbers, either randomly or sequentially, and dial such numbers, thus, fails to state a claim under the TCPA.

This should also be dispositive of Count III in Plaintiff's Complaint, alleging a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, as it is entirely derivative of the alleged TCPA and FDCPA violation. In addition, this Court should dismiss the IFCA claim because Plaintiff has failed to allege any non-de minimis economic damages, if he alleged any at all. The ICFA seeks to protect consumers that have suffered some

actual pecuniary harm as a result of unfair and deceptive business practices. However, actual economic damages in more than de minimis amounts are required to state a claim under the ICFA. Plaintiff's Complaint lacks any actual monetary damage and merely broadly alleges damages. (See Doc. 11 ¶ 24). This is exactly the type of "de minimis" damages repeatedly found to be insufficient to state an ICFA claim by the courts. Because of these deficiencies, and because Plaintiff cannot amend his Complaint to cure these deficiencies, Plaintiff's Complaint must be dismissed in its entirety, and with prejudice.

**B. Plaintiff's Allegations**

Plaintiff's Complaint alleges he began receiving phone calls on his cellular phone related to a credit card debt owed to First National Bank of Omaha. (See Doc. 11 ¶¶ 8, 10). Plaintiff generally alleges that he defaulted on the underlying account in or around November 2018. (See Doc. 11 ¶¶ 9 and 10). The Complaint also generically alleges that the calls to Plaintiff were made using an ATDS based on the allegation that Plaintiff noticed a period of "dead air" while the call connected to a live agent. (See Doc. 11 ¶¶ 15, 16, 18). However, the only assertions in the Complaint regarding the type of equipment used are the following three statements:

> **In the phone calls Plaintiff answered, Plaintiff was greeted by a noticeable period of "dead air" while Defendant's telephone system attempted to connect Plaintiff to a live agent.**
>
> **Specifically, there would be an approximate 3 second pause between the time Plaintiff said "hello," and the time that a live agent introduced them self as a representative of Defendant attempting to speak to Plaintiff.**
>
> **Upon information and belief, Defendant placed its calls to Plaintiff's cellular telephone using an automated telephone dialing system.** (Id. ¶¶ 15, 16, and 18).

The Complaint does not allege that Credit Control left any pre-recorded or automated messages for Plaintiff. Nor does the Complaint allege that Credit Control's telephony equipment had the capacity to generate telephone numbers, either randomly or sequentially, and then dial

3

those numbers, a statutory requirement under the TCPA's definition of automated telephone dialing system. 47 U.S.C. § 227(a)(1), (b)(1)(A)(iii).

With respect to the ICFA claim in Count III, Plaintiff only asserts that Credit Control engaged in "an unfair and deceptive act or practice" by continuing to call Plaintiff after Plaintiff requested for Credit Control to stop calling him. (Id. ¶¶ 12-14.) Indeed, the Complaint is entirely devoid of any allegations that Plaintiff suffered economic damage; the only damage Plaintiff claims he suffered are boilerplate and unsupported by any actual evidence, which include "*invasion of privacy, nuisance, intrusion upon and occupation of Plaintiff's cellular telephone capacity, wasting Plaintiff's time, increased risk of personal injury resulting from the distraction caused by the phone calls, harassment, emotional distress, anxiety, loss of concentration, diminished value and utility of his telephone equipment and telephone subscription services, the wear and tear caused to his cellular telephone, the loss of battery charge, the loss of battery life, and the per-kilowatt electricity costs required to recharge his cellular telephone as a result of increased usage of his telephone services.*" (Id. ¶ 24).

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(c), a motion for judgment on the pleadings should be granted where, as here, "it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief." *Brunt v. SEIU*, 284 F.3d 715, 718-19 (7th Cir. 2002). A Rule 12(c) motion is governed by the same standards as a motion to dismiss under Fed. R. Civ. P. 12(b), such that the Court will accept as true all well-pleaded factual allegations contained in the complaint and draw all reasonable inferences from such well-pleaded facts in favor of the plaintiff. *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000).

Rule 12(c) motions can be brought at any time after the pleadings are closed, as long as it is filed "within such time as not to delay the trial." See Fed. R. Civ. P. 12(c) ("After the pleadings

4

are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."); *Kishwaukee Community Health Serv. Ctr. v. Hospital Bldg. & Equip. Co.*, 638 F. Supp. 1492, 1494–95 (N.D. Ill. 1986) (rejecting plaintiff's claim that motion under Rule 12(c) was untimely, because trial date had been struck without setting a new date and because it found no evidence that the defendants filed the motion for the purpose of delay); *Leadbetter v. City of Fort Wayne*, No. 1:06-CV-285-TS, 2009 WL 2840910, at *1 (N.D. Ind. Sept. 1, 2009) (granting judgment on the pleadings where defendant filed its motion over a year after its answer and after the original deadline for filing dispositive motions).

## III.    ARGUMENT

### A.  Plaintiff's FDCPA Claim Must Be Dismissed Because He Failed To Allege Facts Suggesting or Implying the Subject Debt Was In Default, and Therefore Failed to Allege that Defendant was Acting as a "Debt Collector", a Threshold Issue under the FDCPA.

The FDCPA defines a "debt collector" to mean "[1] any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or [2] who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).  But, the definition excludes several categories of persons, see 15 U.S.C. § 1692a(6)(A)–(F) (listing excluded persons), including "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person," § 1692a(6)(F)(iii).  Whether an entity is subject to the FDCPA as a debt collector depends on the default status of the debt at the time it was obtained. See *Alibrandi v. Fin. Outsourcing Servs.*, 333 F.3d 82, 86 (2d Cir. 2003); *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7thCir. 2003) (The FDCPA "treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee,

and as creditors if it was not."); *McClenahan v. Equifax Info. Servs. LLC*, No. 14-cv-507 (DWF/FLN), 2016 WL 554819, at *3 (D. Minn. Feb. 11, 2016) ("[A] person who obtained the debt at issue when the debt was not in default cannot be liable as a debt collector under the FDCPA."). Additionally, a defendant is not a debt collector if the defendant is servicing, rather than collecting, the plaintiff's debt. See *Motley*, 557 F. Supp. 2d at 1009; see also *Schlosser*, 323 F.3d at 538 ("For those who acquire debts originated by others, the distinction drawn by the statute—whether the loan was in default at the time of the assignment—makes sense as an indication of whether the activity directed at the consumer will be servicing or collection."). A "nonoriginating debt holder," like Viking, is considered a debt collector under the FDCPA if it: (1) acquires debt that is "in default," or (2) treats the acquired debt as if it were "in default" at the time of acquisition. See *Bridge v. Ocwen Fed. Bank*, 681 F.3d 355, 362 (6th Cir. 2012).

In the instant matter, the Plaintiff generally alleges that the underlying debt owed was in default. Plaintiff's only allegations regarding the status of the underlying debt are:

> **Unable to keep up with payments, Plaintiff defaulted on this account, leaving an outstanding balance in the amount of approximately $1000 ("subject debt").**

> **Sometime after Plaintiff defaulted on the account in or around November 2018, Plaintiff began receiving calls to his cellular phone, (847) XXX-2623, from Defendant in an attempt to collect the subject debt. See Doc. 11 ¶¶ 9 and 10.**

The foregoing is insufficient to support any plausible conclusion that the underlying debt was in default at the time it was assigned to Credit Control. Plaintiff does not provide the date of his last payment or transaction on the account. Does not provide any calculation regarding how he determined the underlying debt was in default. The FDCPA does not define default or specifically address when a debt is in default, or acquired as such, but case law provides some guidance. Generally, a debt does not go into default at its inception or immediately after payment

first becomes due. See *Alibrandi v. Fin. Outsourcing Servs.*, 333 F.3d 86-87 (2d Cir. 2003); *Redden v. Capital One Servs., L.L.C.*, No. 15-cv-1640 (JRT/JSM), 2016 WL 386036, at *3 (D. Minn. Feb. 1, 2016). In *Alibrandi*, the Second Circuit held that default does not occur immediately, but rather at some point after the debt is outstanding or delinquent. 333 F.3d at 87. The court reasoned that it would not serve the FDCPA's broad, pro-debtor purpose if a debt went into default immediately after payment becomes due because of the adverse consequences that default imposes on debtors—such as acceleration, repossession, increased interest rates, and negative credit reports. *Id*. Therefore, there must be some period of time after a debt becomes due and is outstanding before it is "in default." Id. at 86–87. Plaintiff alleges he defaulted on the underlying account in or around November 2018, but fails to provide any justification or facts supporting his conclusory legal contention. In fact, it is plausible, based upon Plaintiff's allegations "in or **around** November 2018", that the underlying was not in default until December 2018, January 2019, or even February 2019. Plaintiff simply stating his underlying debt was in default in order to create a catch-all scenario that anyone hired by the creditor to service the underlying account would be deemed a debt collector under the Act is not enough to state a claim under the FDCPA, as it fails to show that Credit Control received the assignment of the debt after the debt was in default.

Therefore, for the foregoing reasons, Credit Control should be granted judgment on the pleadings as to Count I of Plaintiff's Complaint.

**B. Plaintiff's TCPA Claim Must Be Dismissed Based On His Failure To Allege Use Of Random Or Sequential Number Generator.**

The TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any [ATDS] . . . to any telephone number assigned to a . . . cellular telephone service" 47 U.S.C. § 227(b)(1)(A)(iii). The statutory

text defines an ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, ***using a random or sequential number generator***; and (B) to dial such numbers." *Id.* § 227(a)(1) (emphasis added). This definition, on its face, requires that the telephony equipment at issue be capable of performing at least three tasks automatically. ***First***, the equipment must be able to generate random or sequential numbers – otherwise, it cannot have the capacity to do anything "using a random or sequential number generator." 47 U.S.C. § 227(a)(1)(A). ***Second***, the equipment must be able to use that random or sequential number generator in order to produce telephone numbers to be called. That is what it means to have the capacity to "store or produce telephone numbers . . . using a random or sequential number generator." *Id.* And ***third***, the equipment must be able to dial the same telephone numbers that were stored or produced "using a random or sequential number generator." *Id.* § 227(a)(1)(B) (referring to "dial[ing] ***such*** numbers") (emphasis added). The equipment must be able to perform all three of these functions automatically – i.e., without human intervention. *ACA Int'l v. FCC*, 885 F.3d 687, 703 (D.C. Cir. 2018) ("given that 'auto' in autodialer—or, equivalently, 'automatic' in "automatic telephone dialing system," [the statute] would seem to envision non-manual dialing of telephone numbers"). In sum, the phrase "using a random or sequential number generator" describes the process by which the numbers are generated in the first place, and not how they are dialed. *Pinkus*, 319 F. Supp. at 938; *see also Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 371-72 (3d Cir. 2015) (noting that "random or sequential" number generation refers to the numbers themselves rather than the manner in which they are dialed); *Fleming v. Associated Credit Inc.*, No. CV163382KMMAH, 2018 WL 4562460, at *7–8 (D.N.J. Sept. 21, 2018) (same).

Congress targeted equipment generating and dialing numbers in a random or sequential manner because those dialers pose distinctive problems. Such dialers, by definition, call telephone numbers indiscriminately. As a result, they often reach "lines reserved for [specialized] purposes."

S. Rep. No. 102-178, at 2 (1991).  For example, lawmakers heard about one 911 operator who received an automated call that began, "This is your lucky day."  *Computerized Telephone Sales Calls and 900 Service: Hearings Before the Senate Committee on Commerce, Science, and Transportation*, 102d Cong. 34 (1991) (statement of Chuck Whitehead).  Another "horror stor[y]" involved "the man in the hospital bed in the intensive care ward" who received an automated call "offering him a trip to Hawaii."  *Id*. at 28 (statement of Rep. Unsoeld).  Similarly, calls were made to special pagers assigned to patients on organtransplant waitlists, misleading patients into believing that organ matches had been found.  *Telemarketing/Privacy Issues: Hearing Before the House Subcommittee on Telecommunications and Finance*, 102d Cong. 111 (1991) (statement of Michael J. Frawley).

Sequential dialing posed all the same problems, only to a greater degree.  For example, dialing whole blocks of numbers could overwhelm all of the telephone lines in a hospital or police station or fire department.  H.R. Rep. No. 102-317, at 10 (1991); *see also* S. Rep. No. 102178, at 2 (similar).  In one case, a dialer sequentially called telephones in a hospital in Watertown, New York, tying up "exam rooms, patient rooms, offices, labs, emergency rooms, and x-ray facilities" with a pitch for a contest in which participants could win a vacation.  *S. 1462, The Automated Telephone Consumer Protection Act of 1991: Hearing Before the Senate Subcommittee on Communications*, 102d Cong. 43 (1991) (statement of Michael F. Jacobson).  "Lives literally 'hung in the balance' while hospitals were unable to page doctors [or] to reach code blue teams," forced to "stand by, watching the dialer call each and every pager number, one by one, until the dialer ha[d] done its job and all the calls [were] completed."  *Telemarketing Practices: Hearing Before the House Subcommittee on Telecommunications and Finance*, 101st Cong. 79 (1989) (statement of Steven S. Seltzer, President, Modern Communications Corporation).  Cellular networks, too, were vulnerable to sequential dialing.  Because cellular carriers "obtain[ed] large

blocks of consecutive phone numbers for their subscribers," a sequential dialer running through such a group of numbers could "saturate mobile facilities, thereby blocking the provision of service to the public." *Telemarketing/Privacy Issues* 113 (statement of Michael J. Frawley). One carrier "had its system seized by autodialers three separate times for approximately 3 hours each time, during which time the service was totally disrupted to almost 1,000 customers." *Id*.

Congress responded to the unique problems posed by equipment generating and dialing numbers in a random or sequential manner by enacting the TCPA's restrictions on ATDS equipment. Homing in on the technology responsible for these problems, Congress defined an ATDS as equipment that "has the capacity—(A) to store or produce telephone numbers to be called, ***using a random or sequential number generator***; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1) (emphasis added).

Thus, the TCPA did not intend to restrict "predictive dialers" – only dialers utilizing random or sequential number generators to place calls. A predictive dialer is "dialing equipment that can make use of algorithms to assist telemarketers in predicting when a sales agent will be available to take calls." *ACA International*, 885 F.3d at 701. Courts recognize that a predictive dialer is not the same as a dialer using random or sequential number generators. For example, in its landmark decision invalidating the FCC's definition of an autodialer, the D.C. Circuit observed that "at least some predictive dialers . . . have no capacity to generate random or sequential numbers." *ACA International*, 885 F.3d at 702 ("Some predictive dialers cannot be programmed to generate random or sequential numbers," and, instead, "dial from an externally supplied set of numbers").

**C. While Plaintiff Does Not Make Any Allegations That Credit Control Used A Predictive Dialer, The *ACA International* Invalidated The FCC Regulations Holding That Predictive Dialers Qualify As An ATDS.**

While the FCC previously promulgated several regulations equating predictive dialers to an ATDS, those overbroad pronouncements have been invalidated. By way of background, in 2003, the FCC introduced regulations which included "predictive dialers" in its expansive interpretation of what constituted an ATDS. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 Order"), 18 FCC Rcd. 14014, 14091-93 ¶¶ 131-133 (2003). The FCC's 2003 Order that broadly redefined the meaning of "ATDS," while completely illogical, was then confirmed by multiple subsequent Commission orders through the years. *See, e.g.*, *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 5594 (2008) (the "2008 Order"); *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 15391, ¶ 2 n.5 (2012) (the "2012 Order"); *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (the "2015 Order").

However, in March of 2018, the United States Court of Appeals for the D.C. Circuit vacated the Commission's interpretation of the functions of an ATDS (as embodied in the 2003, 2008, 2012 and 2015 Orders) in *ACA International*. The D.C. Circuit criticized the "dissonant understandings of ATDS" by the FCC: one providing that a device qualifies as an ATDS only if it can generate random or sequential numbers to be dialed, and the other that a device can so qualify even if it lacks that capacity. *ACA International*, 885 F.3d at 702-03. Because the 2015 Order—which prompted the petition for review in *ACA International*—"reaffirm[s]" the "prior orders" of the Commission from 2003, 2008 and 2012, by holding that the 2015 Order was arbitrary and capricious, the D.C. Circuit necessarily ruled that the orders it reaffirmed were also arbitrary and capricious. *ACA International*, 885 F.3d at 694. What is more, the D.C. Circuit explicitly rejected the Commission's argument that, "because there was no timely appeal from [those earlier orders], it is too late now to raise a challenge by seeking review of a more recent

11

declaratory ruling that essentially ratifies the previous ones." *Id.* at 701. The Court explained that

the petitioners in *ACA International* had taken the necessary procedural steps to ensure that "the

agency's pertinent pronouncements" were *all* subject to review. *Id.* The D.C. Circuit thus decided

the (in)validity of the 2003, 2008, and 2012 Orders too—and not just the 2015 Order.

Another judge in this District has also recently concluded that *ACA International* has

invalidated the 2003 and 2008 FCC Orders with respect to their pronouncements regarding

predictive dialers. *Pinkus*, 319 F. Supp. 3d at 934 (holding that "*ACA International* necessarily

invalidated the 2003 Order and 2008 Declaratory Ruling insofar as they provide, as did the 2015

Declaratory Ruling, that a predictive dialer qualifies as an ATDS even if it does not have the

capacity to generate phone numbers randomly or sequentially and then to dial them"). Other courts

have followed *Pinkus*'s reasoning, finding it to be persuasive.[1]

The upshot of all of this is that the Court should resolve this case under the plain meaning

of the statute, without regard to the Commission's contradictory orders. Under that plain meaning,

as just set out, only the capacity to conduct random and sequential dialing renders a device an

ATDS; the capacity to conduct predictive dialing does not. *See Marshall v. CBE Group, Inc.*, No.:

2:16–cv–02406–GMN–NJK, 2018 WL 1567852, *5 (D. Nev. Mar. 30, 2018) ("In light of [*ACA*

---

[1] *Fleming v. Associated Credit Servs., Inc.*, No. CV163382KMMAH, 2018 WL 4562460, at *7–8 (D.N.J. Sept. 21, 2018) ("I am convinced by the reasoning in *Pinkus* and similar decisions. I hold that when the D.C. Circuit vacated the 2015 FCC Declaratory Ruling it also necessarily set aside the parts of the previous 2003 and 2008 FCC Orders that ruled that a predictive dialer was impermissible under the TCPA."); *Gary v. TrueBlue, Inc.*, No. 17-10544, 2018 WL 3647046, at *6 (E.D. Mich. Aug. 1, 2018) ("Applying ACA Int'l, the FCC's rulings--including the ATDS definition which covered equipment that can only dial numbers from a set list—are no longer valid."); *Sessions v. Barclays Bank Delaware*, No. 17-1600, 2018 WL 3134439, at *4–*5 (N.D. Ga. June 25, 2018) ("As a result [of ACA International], the Court finds that the FCC's prior orders with regard to interpretations of 'capacity' and descriptions of the statutorily enumerated functions a device must perform to be an ATDS were vacated in ACA International."); *Herrick v. GoDaddy.com LLC*, No. 16-254, 2018 WL 2229131, at *8 (D. Ariz. May 14, 2018) ("[I]n light of the *ACA Int'l* decision, this Court declines to apply such a broad interpretation of this function. Broadening the definition of an ATDS to include any equipment that merely stores or produces telephone numbers in a database would improperly render the limiting phrase 'using a random or sequential number generator' superfluous."); *Dominguez v. Yahoo, Inc.*, 894 F. 3d 116, 121 (3d Cir. 2018) (denying summary judgment to plaintiff who failed to demonstrate that defendant's predictive dialing equipment "had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers" and thus, plaintiff could not claim that he had been called with an ATDS).

*International*], this Court will not stray from the statute's language").[2] Plaintiff has simply failed to allege any facts suggesting or even implying that these necessary elements of an automated telephone dialing system.

### D. Plaintiff Alleged No Facts Suggesting Credit Control's Calls Were Placed With Equipment Having The Capacity To Generate Random or Sequential Numbers.

In light of *ACA International*'s recognition that some predictive dialers cannot constitute an ATDS, this District, and others, have required plaintiffs to specifically allege facts to suggest that a random or sequential number generator and dialer was used. In *Pinkus v. Sirius XM Radio Inc.*, for example, a TCPA plaintiff alleged that "the calls were placed using predictive dialing technology, which automatically places calls without human intervention until the called party answers the call, at which time such automatic dialer attempts to connect the called party." 317 F. Supp. 3d at 931. Pinkus further alleged that "no customer service representative was on the line when he answered the calls, and that he would experience a delay after answering until a representative began speaking." *Id*. Thus, the complaint in *Pinkus* rested on the premise that a predictive dialer qualified as an ATDS under the TCPA, even if it lacked the capacity to generate random or sequential telephone numbers to be dialed, and to dial such numbers. *Id.*

In a well-reasoned decision followed by numerous other courts, the *Pinkus* Court held that "an ATDS ***must*** have the capacity to generate telephone numbers, either randomly or sequentially,

---

[2] To the extent the Court wishes to consult any regulations, the relevant regulations are the ones that were in place before 2003. Those regulations—specifically, the Commission's 1992 and 1995 Orders—interpret the TCPA in accordance with its plain meaning. They expressly state that a device is an ATDS only if "the numbers called are . . . generated in a random or sequential fashion." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, ¶ 47 (1992); *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, ¶ 19 (1995) (device qualifies as an ATDS only if it calls "randomly or sequentially generated numbers"); *Dominguez*, 629 F. App'x at 372 (Commission "initially interpreted the [TCPA] as specifically targeting equipment that placed a high volume of calls by randomly or sequentially generating the numbers to be dialed"). Now that the D.C. Circuit has set aside the Commission's most recent rulings, these earlier Orders—which the Commission has never reversed, vacated, or disavowed—constitute the Commission's last valid word about the functions of an ATDS. That last word confirms that the statute means what it says: the ATDS provision reaches dialers with random and sequential number generators, but not predictive dialers.

and then to dial those numbers." *Id.* at 938. (Feinerman, J.) (emphasis added). As such, the Court entered judgment on the pleadings in the defendant's favor because the plaintiff's complaint "does not plausibly allege that he was called with a device that has the capacity to store or produce numbers that have been randomly or sequentially generated." *Id.* at 939. See also *Gadelhak v. AT&T Services, Inc.*, No. 17-cv-1559, 2019 WL 1429346 at *6-7 (N.D. Ill. Mar. 29, 2019) (finding that defendant's equipment which dialed numbers from a generated list did not qualify as an autodialer) (Chang, J.); *Bader v. Navient Solutions, LLC*, 2019 U.S. Dist. LEXIS 100396 (N.D.Ill June 14, 2019) (dismissing plaintiff's claims because he did not put forth any factual allegations that suggest Navient Solutions dialed his number using equipment that had the capacity to generate random or sequential numbers.) (Coleman, S.).

The same result must follow here. Just like the plaintiff in *Pinkus*, and other cases, Plaintiff failed to allege any facts suggesting that the calls at issue were made with a dialer using random or sequential number generator. In fact, Plaintiff's Complaint is devoid of any facts that could reasonably conclude that Credit Control utilized any ATDS and fails to plead any factual matter that supports an inference that Credit Control's dialing equipment has the capacity to generate telephone numbers, either randomly or sequentially, and then to dial those numbers.

Plaintiff only asserts that he experienced a "noticeable period of 'dead air'", before being connected to a live representative. (Compl. ¶ 15). But this allegation has nothing to do with a dialer using a random or sequential number generator, since a "pause does not create a plausible inference regarding the capacity . . . to make random calls." *Smith v. Aitima Medical Equipment, Inc.*, No. ED CV 16-00339-AB (DTBx), 2016 WL 4618780, at *6 (C.D. Cal. Jul. 29, 2016). If anything, Plaintiff's Complaint *negates* the inference that Credit Control used a system with a random or sequential number generator. The Complaint asserts that Credit Control called Plaintiff multiple time in one day to collect a debt owed to First National Bank of Omaha. (Compl. ¶¶ 12,

14

17). It is implausible that equipment that generates telephone numbers randomly or sequentially would dial the same person multiple times in one day.

It is true that, before *ACA International*, some district courts ruled that pauses could support an inference that the defendant used an ATDS. But these decisions simply reasoned that a pause suggests the use of a predictive dialer and that (under the FCC's then-controlling orders) a predictive dialer is, in turn, an ATDS. *See, e.g.*, *Toney v. Quality Resources, Inc.*, 75 F. Supp. 3d 727, 732 (N.D. Ill. 2014) ("The call started with a distinctive click and pause prior to the caller's coming on the line, indicating that it was coming from a predictive dialer, an automatic telephone dialing system"); *Lofton v. Verizon Wireless (VAW) LLC*, No. 13–cv– 05665–YGR, 2015 WL 1254681, at *5 (N.D. Cal. Mar. 18, 2015) ("the 'telltale' pause after plaintiff picked up each call until the agent began speaking . . . suggests the use of a predictive dialing system, and thus renders plausible the conclusory allegation that an ATDS was used").

The premise that a predictive dialer is an ATDS is now no longer tenable after the D.C. Circuit's decision in *ACA International*. As *Pinkus* recognized, decisions leaping from pauses to predictive functionality and from predictive functionality to ATDS status are no longer persuasive.

Therefore, for the foregoing reasons, Credit Control is entitled to judgment on the pleadings as to Count II of Plaintiff's Complaint.

**E. Plaintiff's ICFA Claim Must Be Dismissed Based On His Failure To Allege A TCPA Violation And Based On His Failure To Allege Any Actual Non-Economic Damages.**

Plaintiff has failed to plead his claim under the ICFA because he failed to allege any non-*de minimis* economic harm. The ICFA provides that certain "unfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce" are unlawful. 815 Ill. Comp. Stat. 505/2. To plead a claim under the ICFA, a plaintiff must demonstrate, among other things, that the plaintiff sustained actual damages. *Able Home Health, LLC v. Onsite*

15

*Healthcare, Inc, SC*, No. 16-cv-8219, 2017 WL 2152429, at \*4 (N.D. Ill. May 17, 2017); *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014). "Actual damages" are those that arise from purely economic injuries.[3] While plaintiffs may recover for actual damage in the forms of emotional distress, or mental anguish, for example—any such recovery <u>must</u> include or arise from actual ***economic*** damage. *Nelson v. Ashford Univ., LLC*, No. 16-CV-3491, 2016 WL 4530325, at \*3 (N.D. Ill. Aug. 29, 2016) (emphasis added).[4]

Plaintiff alleges that Credit Control's calls caused him "invasion of privacy, nuisance, intrusion upon and occupation of Plaintiff's cellular telephone capacity, wasting Plaintiff's time, increased risk of personal injury resulting from the distraction caused by the phone calls, harassment, emotional distress, anxiety, loss of concentration, diminished value and utility of his telephone equipment and telephone subscription services, the wear and tear caused to his cellular telephone, the loss of battery charge, the loss of battery life, and the per-kilowatt electricity costs required to recharge his cellular telephone as a result of increased usage of his telephone services." (Compl. ¶ 24). But these categories of alleged harm do not constitute economic damage without specific allegations that the claimed damage resulted in additional monetary costs or rendered the phone unusable. *Nelson*, 2016 WL 4530325, at \*3.

Plaintiff does not allege any actual monetary damages. Courts in this district have repeatedly held that "the harm or injury alleged must include or arise from actual economic

---

[3] *Gagnon v JPMorgan Chase Bank, N.A.*, 563 B.R. 835, 848 (N.D. Ill. 2017) ("emotional damages do not constitute actual damages under the ICFA. . . .[i]nstead, allegations of actual pecuniary loss are required"); *Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F. Supp. 2d 898, 913 (N.D. Ill. 2012) (dismissing the plaintiff's claim because "where a plaintiff only alleges that she suffered emotional damages in an ICFA claim, such allegations are not sufficient to survive a motion to dismiss"); *Alabi v. Homecomings Fin. LLC*, No. 09–cv–4757, 2011 U.S. Dist. LEXIS 107632, at \*25–26 n.12, 2011 WL 4398140, at \*7 (N.D. Ill. Sep. 21, 2011) (disregarding the allegation that the defendants' conduct caused the plaintiff "confusion and concern" because "the ICFA allows remedies only for economic injuries, not for emotional distress").

[4] *See also Worix v. MedAssets, Inc.*, 869 F. Supp. 2d 893, 901 (N.D. Ill. 2012); *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988 (N.D. Ill. 2016); *Dolemba v. Kelly Services, Inc.*, No. 16 C 4971, 2017 WL 429572 (N.D. Ill. Jan. 31, 2017); *Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill. App. 3d 399, 403, 911 N.E.2d 1049, 1054 (2009).

damages that are more than *de minimis* or trifling in amount." *Dolemba v. Ill. Farmers Ins. Co.*, 213 F. Supp. 3d 988, 998 (N.D. Ill. 2016) (dismissing the complaint where it did not specify what injuries, costs, or harms plaintiff purportedly suffered and did not allege anything that under any circumstance could be considered "substantial injury" to anyone); *Orrington v. Scion Dental, Inc*, No. 17-CV-00884, 2017 WL 5569741, at *6 (N.D. Ill. Nov. 20, 2017) ("Assuming a loss of 2 cents per page for each unauthorized two-page fax, [a] class [of plaintiffs] would have to consist of 2,500 people before the alleged harm plausibly reaches even $100....plaintiff alleges...there are more than 40 members of the class...or an aggregate harm of $1.60...By any standard, that is not a substantial injury."); *Stonecrafters, Inc. v. Foxfire Printing & Packaging, Inc*., 633 F. Supp. 2d 610, 617 (N.D. Ill. 2009) (dismissing the ICFA claims based on the absence of the alleged "substantial injury to consumer"). Plaintiff's boilerplate and unsupported allegations of damages are inadequate to demonstrate adequate economic harm, and other cases whereby a plaintiff has alleged more details of damages than Plaintiff has here, such have failed to state a claim.[5]

Therefore, for the foregoing reasons, Credit Control is entitled to judgment on the pleadings as to Count III of Plaintiff's Complaint.

## IV.    CONCLUSION

For all the foregoing reasons, Credit Control respectfully requests that this Court grant its Motion for Judgment on the Pleadings and any other relief this Court deems just and proper.

---

[5] *See, e.g.*, *Stonecrafters, Inc.*, 633 F. Supp. 2d at 617 (dismissing an ICFA claim where the alleged economic harm was based on printing one sheet of paper with a "small amount of ink"); *Kim v. Sussman,* No. 03 CH 07663, 2004 WL 3135348, at *3 (Ill. Cir. Ct. Oct.19, 2004) (damages resulting from conversion of the paper and toner necessary to print unsolicited facsimile "are minuscule, *i.e.,* pennies per plaintiff."); *W. Ry. Devices Corp. v. Lusida Rubber Prods., Inc.,* No. 06 C 0052, 2006 WL 1697119, at *6 (N.D. Ill. Jun. 13, 2006) (internal quotation marks omitted) ("[t]he cost of receiving and printing a single page facsimile advertisement cannot be characterized as significant harm.").

July 12, 2019                                    Respectfully Submitted,

                                                 WATTS LAW GROUP, LLC

                                                 *Attorneys for Defendant*
                                                 Credit Control, LLC

                                                 By:/s/ Patrick A. Watts
                                                 Patrick A. Watts, Esq.
                                                 150 S. Wacker Dr. Suite 2400
                                                 Ph: (312) 741-0990
                                                 Email: pwatts@swattslaw.com


## CERTIFICATE OF SERVICE

### (electronic filing)

**I HEREBY CERTIFY** that on July 12, 2019, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system which will send notification of such filing to the following counsel of record:

Alexander J. Taylor, Esq.
Marwan R. Daher, Esq.
Omar T. Sulaiman, Esq.
Sulaiman Law Group, Ltd
2500 S Highland Ave, Suite 200
Lombard, IL 60148
Telephone: (630) 575-8181
ataylor@sulaimanlaw.com
mdaher@sulaimanlaw.com
osulaiman@sulaimanlaw.com

*Attorneys for Plaintiff*


                                                 /s/:  Patrick A. Watts