## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **ANUP PARMAR,** | |
| **PLAINTIFF,** | **Case No.: 1:19-cv-00387** |
| **v.** | **Judge Rebecca R. Pallmeyer** |
| **CREDIT CONTROL, LLC** | |
| **DEFENDANT.** | |

### DEFENDANT, CREDIT CONTROL, LLC
### MOTION TO STAY PROCEEDINGS

Defendant, Credit Control, LLC ("Credit Control") by and through its undersigned counsel, submits this Motion to Stay Proceedings pending rulings from the Federal Communications Commission ("FCC" or "Commission") regarding the definition of an automatic telephone dialing system under the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*. ("TCPA").

## I.      INTRODUCTION

*"[W]hat constitutes an 'automatic telephone dialing system?"*[1] The FCC posed this question in its May 14, 2018 Request for Public Comment, which followed closely on the heels of the D.C. Circuit's decision in *ACA International v. Fed. Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018).  At the present moment, the definition of what is and is not an auto-dialer is in a state of complete unknown.  On June 26, 2019, The U.S. Supreme Court affirmatively ruled that the federal Court's should grant deference to an agency's interpretation of its ambiguous rules

---

[1] FCC Public Notice, "Consumer and Governmental Affairs Bureau Seeks Comment on Interpretation of the Telephone Consumer Protection Act in Light of the D.C. Circuit's ACA International Decision," CG Docket Nos. 18-152, 02-278 ("FCC's Request for Comment").

and regulations.  *Kisor* v. *Wilkie, Secretary of Veterans Affairs* No. 18-14; 588 U.S. ___ (June 26, 2019).  This deference cannot be ignored.  Although Credit Control believes the calls at issue in this action were not made using an automatic telephone dialing system[2]—under *any* standard and that Plaintiff's Complaint should be dismissed for failure to allege use of an ATDS—the definition of an autodialer has been left in doubt since the D.C. Circuit's March 16, 2018 ruling in *ACA International*.  In its ruling, the D.C. Circuit vacated the FCC's prior rulings regarding the definition of an autodialer but failed to promulgate a new standard—causing courts to split over the scope and impact of its ruling and prompting the FCC to issue a Request for Public Comment, in which the FCC indicates that it will clarify the nature and constituent elements of an autodialer. The FCC, has yet to promulgate its interpretation of the definition of an autodialer to date necessitating the need for this motion.

The FCC has the required expertise and authority to determine the scope and nature of an autodialer under the TCPA and was granted the authority by Congress to resolve in the first instance issues regarding implementation and enforcement of the TCPA.  A decision by the FCC providing guidance on the definition of an autodialer will have a significant— potentially dispositive—impact on this case should it continue past the pleading stage.  *See Kisor v. Wilki* 588 US. ____ (June 26, 2019).  The FCC on May 14, 2018, requested comments on several issues related to the interpretation and implementation of the TCPA with the comment period concluding on June 28, 2018.[3]Accordingly, a stay is warranted under the primary jurisdiction doctrine until such time that the FCC issues a ruling.

---

[2] Automatic Telephone Dialing System" is hereinafter referred to as "ATDS" or "autodialer." *See* FCC's Request for Comment, at 1 n.3 ("The Commission's rules also use the term 'autodialer,' which we have defined as synonymous with an automatic telephone dialing system.").

[3] As addressed *infra*, the FCC briefly reopened the comment period until October 24, 2018.

Indeed, in July, Judge Rosenberg issued a stay in a putative TCPA class action until the FCC issues its ruling on the ATDS definition. *See Buhr v. ADT LLC*, No. 18-cv-80605, Dkt. No. 40 (S.D. Fla. July 25, 2018). Additionally, in *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, 2018 WL 2455301 (M.D. Fla. June 1, 2018), Judge Steele in a similar TCPA case dealing with facsimile technology granted a stay pending a decision by the FCC under the primary jurisdiction doctrine.[4] As explained below, the rationale for issuing a stay in *Buhr* and *Scoma* applies with equal, if not greater, force to this case for the following reasons:

First, the FCC is currently considering the precise questions at issue here: "[w]hat constitutes an automatic telephone dialing system [under the TCPA]?" "How 'automatic' must dialing be for equipment to qualify as an automatic telephone dialing system? Must such a system dial numbers without human intervention?" "If equipment cannot itself dial random or sequential numbers, can that equipment be an automatic telephone dialing system?"[5] Credit Control has filed an answer denying Plaintiff's allegations that would support his claim under the TCPA, *see* ECF No. 14; however; if this case moves beyond the pleading stage, whether an autodialer was used will continue to be a central, dispositive, and the question at issue in this litigation.

Second, courts have already reached inconsistent determinations regarding the definition of an autodialer in the wake of the D.C. Circuit's ruling. Some courts have held that the D.C. Circuit's ruling vacated all the FCC's prior orders regarding the definition of an autodialer, leaving

---

[4] On the other hand, further emphasizing the unsettled nature of the relevant law, some courts have exercised their discretion to deny stays. *See e.g., Cline v. Ultimate Fitness Group, LLC*, Case No. 6:18-cv-771-Orl-37GJK, ECF No.65 (M.D. Fla. February 12, 2019) (acknowledging that "additional guidance from the FCC would aid the Court in its determination," but holding the court was capable of adjudicating the case in the current landscape, and noting that "[f]aced with the same murky sky, other district courts have continued to take off and descend, albeit with diverse flight patterns."). Credit Control submits that the better view is to grant the stay for the reasons set out herein, particularly in light of Plaintiff's largely recycled and boilerplate allegations regarding the equipment allegedly used, as discussed *infra*. Indeed, in *Cline*, the defendant's Motion to Stay was supported by an employee declaration indicating a handheld cell phone was used, placing the matter squarely within the ruling of *ACA*.
[5] *See* FCC's Request for Comment at 2–3.

only the statutory definition—*i.e.*, only systems that can themselves dial randomly or sequentially produced telephone numbers.[6]   Other courts have held that the FCC's 2003 Order regarding predictive dialers remains in force.[7]   It is certain that courts will continue to reach disparate conclusions regarding the definition of an autodialer and the exact nature of human intervention required.[8]   If this case proceeds to judgment without the FCC's guidance, "there is a risk that the Court could reach a determination that is inconsistent with the FCC's ultimate decision" on the definition of an autodialer.  *Scoma*, 2018 WL 2455301 at *3.

Third, considerations of prejudice and the potential costs of not awaiting agency review counsel in favor of a stay.  Plaintiff seeks redress for calls made allegedly to his cell phone utilizing an ATDS and seeks statutory damages, punitive damages, actual damages, and treble damages, creating the possibility for an astronomical aggregated statutory damages award.  *See* ECF No. 11. The underlying basis for such award, however, would be extinguished if the FCC issues a ruling clarifying that the equipment used is not an ATDS.   Under these circumstances, courts routinely find that any prejudice to the non-moving party is outweighed by the potential harm to the moving party and the interests of avoiding inconsistent decisions.   Furthermore, Plaintiff will suffer no prejudice.   There is little risk that the harms Plaintiff alleges will recur because she claims she received only two messages and makes no allegation that the messages have continued.   The

---

[6] *See, e.g.*, *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 935 (N.D. Ill. 2018) ("*ACA International* necessarily invalidated the 2003 and 2008 Declaratory Ruling insofar as they provide, as did the 2015 Declaratory Ruling, that a predictive dialer qualifies as an ATDS even if it does not have the capacity to generate phone numbers randomly or sequentially and then dial them.").

[7] *See, e.g., Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV, 2018 WL 2220417, at *9 (S.D. Fla. May 14, 2018) (holding that the D.C. Circuit left the FCC's 2003 Ruling regarding predictive dialers intact).

[8] *See King v. Time Warner Cable Inc.*, No. 15-2474-CV, 2018 WL 3188716, at *7 (2d Cir. June 29, 2018) (noting *ACA* "declined to adopt" a human intervention standard and that "[g]iven these uncertainties, we venture no opinion on whether … lack of human involvement is a consideration relevant to King's claims").

potential substantial harm to Credit control—which could later be invalidated—outweighs the negligible harm to Plaintiff in waiting to possibly recover statutory damages.

Ultimately, just as in *Scoma*, "a stay will simplify and streamline the issues raised in this case and reduce the burden of litigation on the parties and on the Court. Any delay plaintiff[] will experience in this case is outweighed by the potential prejudice that could inure to [Credit Control] that might very well not fit within the [definition of an autodialer] following the FCC's decision." *Scoma*, 2018 WL 2455301 at *4. Congress granted the FCC the authority to resolve issues regarding implementation and enforcement of the TCPA. A stay is therefore appropriate to enable the FCC to provide guidance on issues that are central to this case and which fall squarely within the FCC's primary jurisdiction.

## A. BACKGROUND

### 1. Plaintiff's TCPA Claim Turns on Whether an Autodialer Was Used.

Plaintiff's Complaint alleges he began receiving phone calls on his cellular phone related to a credit card debt owed to First National Bank of Omaha. (See Doc. 11 ¶¶ 8, 10). The Complaint also generically alleges that the calls to Plaintiff were made using an ATDS based on the allegation that Plaintiff noticed a period of "dead air" while the call connected to a live agent. (See Doc. 11 ¶¶ 15, 16, 18). However, the only assertions in the Complaint regarding the type of equipment used are the following three statements:

> **In the phone calls Plaintiff answered, Plaintiff was greeted by a noticeable period of "dead air" while Defendant's telephone system attempted to connect Plaintiff to a live agent.**
>
> **Specifically, there would be an approximate 3 second pause between the time Plaintiff said "hello," and the time that a live agent introduced them self as a representative of Defendant attempting to speak to Plaintiff.**
>
> **Upon information and belief, Defendant placed its calls to Plaintiff's cellular telephone using an automated telephone dialing system.** (Id. ¶¶ 15, 16, and 18).

The Complaint does not allege that Credit Control left any pre-recorded or automated messages for Plaintiff. Nor does the Complaint allege that Credit Control's telephony equipment had the capacity to generate telephone numbers, either randomly or sequentially, and then dial those numbers.

While the factual allegations are in dispute, to maintain his claim, Plaintiff must establish that the device used to make calls to Plaintiff constitutes an ATDS. The TCPA makes it unlawful for a person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A). Therefore, to state a claim under the TCPA, a plaintiff must allege that (1) the defendant made a call to a cell phone, (2) by the use of an automatic dialing system or an artificial or recorded voice, and (3) without prior express consent of the called party. *See Cummings v. Rushmore Loan Management Service*, 2017 WL 4005455, *2 (M.D. Fla. Sep. 12, 2017).

Accordingly, in this case, a central dispositive question will be whether an autodialer was used—a question over which the parties will surely disagree and which will require this Court to determine the precise contours of what constitutes an autodialer.

**B. The Evolution of the Definition of An Autodialer Under the TCPA.**

The TCPA was enacted in 1991, and an ATDS as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator[,] and . . . to dial such numbers." 47 U.S.C. § 227(a)(1). The TCPA also mandates that the FCC prescribe regulations to implement the requirements of the TCPA, which it has done through a "series of rulemakings and declaratory rulings addressing the Act's reach." *ACA Int'l*, 885 F. 3d at 693.

Following the TCPA's enactment, the FCC affirmed that an ATDS must generate numbers in a random or sequential fashion. In 1992, the FCC issued an order stating that the TCPA's prohibitions against using an ATDS "clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 1776 (1992). And, in a follow-on 1995 ruling, the FCC described "calls dialed to numbers generated randomly or in sequence" as "autodialed." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 F.C.C. Rcd. 12391, 12400 (1995).

In 2003, the FCC issued an order finding, among other things, "that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14093 (2003) ("2003 Order"). The 2003 FCC order defined a predictive dialer as "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call." *Id.* at 14143 n.31. The FCC determined that predictive dialers fall within the definition of an ATDS, even though they may not "store or produce telephone numbers to be called, using a random or sequential number generator," as set forth in the text of the TCPA. *Id.* at 14091. The FCC concluded that the defining characteristic of an ATDS is "the capacity to dial numbers without human intervention." *Id.* at 14092. Though a predictive dialer might not fit squarely within the TCPA's statutory definition of an ATDS, the FCC found that it is the sort of *automated* equipment Congress intended to address through the TCPA because it has the "capacity to dial numbers without human intervention." *Id.* at 14092–93.

In 2008, the FCC issued a declaratory judgment that "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 566 (2008). In 2012, the FCC again reiterated that the TCPA's definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and dial them *without human intervention* regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15391, 15392 n.5 (2012) (emphasis added).

Finally, in 2015, the FCC issued another declaratory ruling dealing with the definition of an autodialer. *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) ("2015 Order"). In its 2015 Order, the FCC took an expansive view of the definition of an autodialer, stating that the "capacity" to dial numbers randomly or sequentially "includes … potential functionalities," not just its "present ability." *Id.* at 7974–76. Despite promulgating this broad definition, the FCC reaffirmed that "the basic functions of an autodialer is to dial numbers *without human intervention*." *Id.* 7975 (internal quotations omitted) (emphasis added).

## C. *ACA International* and the FCC's Request for Public Comment

On March 16, 2018, the D.C. Circuit struck down portions of the 2015 Order, and Credit Control contends (as several courts have concluded) vacated the FCC's 2003 and 2008 rulings regarding the definition of an autodialer, holding that the FCC's Order "falls short of reasoned decisionmaking in 'offer[ing] no meaningful guidance' to affected parties" because it chose differing, contrary interpretations or no interpretations at all as to ATDS functionality. *ACA*, 885 F.3d at 701. Specifically, the D.C. Circuit held that:

- Regarding the question of "what it means for equipment to have the 'capacity' to perform the autodialer functions enumerated in the statute," the D.C. Circuit noted that "the Commission adopted an expansive interpretation of 'capacity' having the apparent effect of embracing any and all smartphones." *Id.* at 695–96. This expansive definition, according to the D.C. Circuit, swept too far: "The more straightforward understanding of the Commission's ruling is that all smartphones qualify as autodialers because they have the inherent 'capacity' to gain ATDS functionality by downloading an app. That interpretation of the statute, for all the reasons explained, is an unreasonably, and impermissibly, expansive one." *Id.* at 700.

- On the question of whether the 2003 and 2008 Orders' expansion of the ATDS definition to include predictive dialers remained valid, the D.C. Circuit said it did not.[9] Specifically, regarding "whether a device must itself have the ability to generate random or sequential telephone numbers to be dialed" or can simply "call from a database of telephone numbers generated elsewhere," the D.C. Circuit said the FCC was "of two minds on the issue." *Id.* at 701. Rather than allow for the latter possibility, the D.C. Circuit stated that the FCC "fail[ed] to satisfy the requirement of reasoned decisionmaking interpretation" and held that "[w]e must therefore set aside the Commission's treatment of those matters." *Id.* at 703.

---

[9] Indeed, the D.C. Circuit explicitly rejected the FCC's objection that the Court lacked jurisdiction to hear a challenge concerning the functions an ATDS must be able to perform because "the issue was resolved in prior agency orders –specifically, declaratory rulings in 2003 and 2008." *Id.* at 701. The D.C. Circuit emphasized that "[w]hile the Commission's latest ruling purports to reaffirm the prior orders, **that does not shield the agency's pertinent pronouncements from review**." *Id.* (emphasis added). As such, the D.C. Circuit "set aside the Commission's treatment of those matters." *Id.* at 703.

- Regarding the question of human intervention, the D.C. Circuit noted that although the FCC had consistently stated "that the 'basic function' of an autodialer is the ability to 'dial numbers without human intervention,'" it "nevertheless declined a request to 'clarify[ ] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention.'" *Id.* at 703 (quoting 30 FCC Rcd. at 7973, 7975–76). The D.C. Circuit concluded that "[t]hose side-by-side propositions are difficult to square"—*i.e.*, that a device may be an autodialer even if it dials numbers with human intervention even though the "basic function of an autodialer is to dial numbers without human intervention." *Id.* at 703.

- Finally, the D.C. Circuit noted that "the Commission further said that another 'basic function[ ]' of an ATDS is to 'dial thousands of numbers in a short period of time.' But the ruling imparts no additional guidance concerning whether that is a necessary condition, a sufficient condition, a relevant condition even if neither necessary nor sufficient, or something else. Nor does it indicate what would qualify as a 'short period of time.' Again, affected parties are left in a significant fog of uncertainty about how to determine if a device is an ATDS so as to bring into play the restrictions on unconsented calls." *Id.*

Given the D.C. Circuit's decision, the FCC must now decide if anything beyond a system that randomly or sequentially generates numbers and then dials them can constitute an ATDS. If the FCC answers that question in the affirmative, it must clarify, *inter alia*, what human intervention is required, and what dialing thousands of numbers at a time really means. Summarizing its decision, the D.C. Circuit succinctly concluded that:

> [T]he Commission's ruling, in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking. The order's lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive

understanding of when a device has the "capacity" to perform the necessary functions. We must therefore set aside the Commission's treatment of those matters.

Just two months after the D.C. Circuit's ruling, the FCC issued its Request For Comment regarding the interpretation and implementation of the TCPA with initial comments due on June 13, 2018 and reply comments due June 28, 2018. In its Request, the FCC posed the following pertinent questions:

We seek further comment on the functions a device must be able to perform to qualify as an automatic telephone dialing system. Again, the TCPA defines an "*automatic* telephone dialing system" as "equipment which has the capacity— (A) to store or produce telephone numbers to be called, *using a random or sequential number generator*; and (B) to dial *such numbers*." Regarding the term "automatic," the Commission explained that the "basic function[]" of an automatic telephone dialing system is to "dial numbers without human intervention" and yet "declined to 'clarify[] that a dialer is not an [automatic telephone dialing system] unless it has the capacity to dial numbers without human intervention.'" As the court put it, "[t]hose side-by-side propositions are difficult to square." The court further noted the Commission said another basic function was to "dial thousands of numbers in a short period of time," which left parties "in a significant fog of uncertainty" on how to apply that notation. How "automatic" must dialing be for equipment to qualify as an automatic telephone dialing system? Does the word "automatic" "envision non-manual dialing of telephone numbers?" Must such a system dial numbers without human intervention? Must it dial thousands of numbers in a short period of time? If so, what constitutes a short period of time for these purposes?

Request for Comment at 2–3 (internal citations omitted) (emphasis in original).

On October 3, 2018, the FCC issued a public notice seeking further comment on the ATDS definition in light of the Ninth Circuit's decision in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018) discussed *infra*. *See* Consumer and Governmental Affairs Bureau Seeks Further Comment on Interpretation of the Telephone Consumer Protection Act in Light of the Ninth Circuit's *Marks v. Church San Diego, LLC* Decision, Docket No. 02-278 (Oct. 3, 2018). The FCC set a comment deadline of October 17, 2018 and a reply comment deadline of October 24, 2017. *See id*

The questions posed by the FCC, and how the FCC ultimately answers them, will likely be dispositive of the merits questions before the Court in this case.

### D. Post-*ACA International* Decisions Have Inconsistently Interpreted the Definition of An Autodialer.

In just the few months following the D.C. Circuit's ruling in *ACA International*, courts have split over the import of the decision, the status and continuing viability of the FCC's prior Orders, and the definition of an autodialer.

The Second, Third, and Ninth Circuits have issued opinions on the ATDS definition since *ACA International* and have taken diverging views. Both the Second and Third Circuits agreed with the D.C. Circuit's holding that the ATDS definition cannot include a system's potential capacities. *See King*, 2018 WL 3188716, at *3 ("Although we are not bound by the D.C. Circuit's interpretation of the statute, we are persuaded by its demonstration that interpreting 'capacity' to include a device's 'potential functionalities' after some modifications extends the statute too far."); *Dominguez v. Yahoo, Inc.*, No. 171243, 2018 WL 3118056, at *2 (3d Cir. June 26, 2018) ("In light of the D.C. Circuit's holding, we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling. [Plaintiff] can no longer rely on his argument that the

Email SMS Service had the latent or potential capacity to function as autodialer.").  Additionally, the Third Circuit expressly stated that random or sequential number generation is required to fit within the statutory ATDS definition and the Second Circuit appeared to accept that approach.  *See Dominguez*, 2018 WL 3118056, at *2 (stating "key factual question" is "whether the Email SMS System functioned as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers"); *see generally King*, 2018 WL 3188716.  Despite these holdings, neither court reached the questions of whether the FCC's prior orders regarding predictive dialers, *see supra* Section II.B, remain good law[10] or how the human intervention standard has been affected.  *See generally King*, 2018 WL 3188716; *Dominguez*, 2018 WL 3118056.  Indeed, the Second Circuit in *King* expressly highlighted the open questions that remain in the wake of *ACA International* decision.  In response to "Time Warner['s] argu[ment] that the district court improperly relied on a 'human involvement' standard that is not reflected in the statute," the court noted that the FCC declined to adopt a standard in its 2015 Order and stated "we venture no opinion on whether that lack of human involvement is a consideration relevant to King's claims."  *King*, 2018 WL 3188716, at *7.

The Ninth Circuit in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018) took a different approach.  In *Marks*, the Ninth Circuit held that *ACA International* vacated the prior FCC orders regarding the ATDS definition and, based on the statutory text alone— which it found "not susceptible to a straightforward interpretation"—found that "equipment that ma[kes] automatic calls from lists of recipients [is] also covered by the TCPA."  *Marks*, 904 F.3d at 1051.

---

[10] Although the Second and Third Circuits did not reach this question, the D.C. Circuit plainly rejected the expansion of the ATDS definition to include predictive dialers.  *See supra* Section II.C.  Regardless, the predictive dialer standard is irrelevant to the current dispute.  A predictive dialer is designed for voice communications, and assists telemarketers in predicting when a sales agent will be available to take calls.

The Ninth Circuit thus departed from the Third Circuit's holding that random or sequential number generation is required for a device to be considered an ATDS and, in fact, read the words random or sequential number generator out of the statute. The Ninth Circuit, differing from the Second Circuit in *King*, also offered its opinion on the human intervention issue, stating that "[w]e also reject Crunch's argument that a device cannot qualify as an ATDS unless it is fully automatic, meaning that it must operate without any human intervention whatsoever" and that the at-issue system "dials numbers automatically, and therefore it has the automatic dialing function necessary to qualify as an ATDS." *Id.* at 1053. The *Marks* decision has not become final because mandate is stayed pending decision on the petition for writ of certiorari filed by Crunch with the United States Supreme Court on January 28, 2019.

Accordingly, in the wake of *ACA International*, the circuit courts through differing opinions have not resolved the open questions regarding the autodialer definition.

Unsurprisingly given this lack of clarity, district courts are also split on the impact of *ACA International*. Several district courts have held that the prior FCC Orders are all vacated by *ACA International*. In *Pinkus*, 319 F. Supp. 3d at 935, a district of in Illinois held that "*ACA International* necessarily invalidated the 2003 and 2008 Declaratory Ruling insofar as they provide, as did the 2015 Declaratory Ruling, that a predictive dialer qualifies as an ATDS even if it does not have the capacity to generate phone numbers randomly or sequentially and then dial them." *See also Gonzalez v. Ocwen Loan Servicing, LLC*, No. 5:18-CV-340-OC-30PRL, 2018 WL 4217065, at *5-6 (M.D. Fla. Sept. 5, 2018) (holding *ACA International* overturned 2003 and 2008 FCC orders).

By contrast, in *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV, 2018 WL 2220417, at *1 (S.D. Fla. May 14, 2018), a court in the Southern District of Florida erroneously held that the

FCC's 2003 and 2008 predictive dialer rulings were *not* vacated by *ACA International* and remain binding law, even if the 2015 Order was set aside as inconsistent with those earlier rulings. *Id.*

Courts are also split on the issue of human intervention. Seemingly in contrast to the Ninth Circuit's narrow application of the human intervention standard in *Marks*, at least one court in the Eleventh Circuit has found that human intervention disqualifies equipment as an autodialer. *See Glasser v. Hilton Grand Vacations Co., LLC*, No. 8:16-CV-952-JDW-AAS, 2018 WL 4565751, at *4 (M.D. Fla. Sept. 24, 2018) (granting defendant's motion for summary judgment in TCPA case on the ground that equipment in question required human intervention to trigger initiation of calls and noting that the D.C. Circuit's holding in *ACA International* "set aside" the FCC's 2015 Order but "left intact earlier FCC rulings that 'the 'basic function' of an autodialer is to dial numbers without human intervention.'").

These court rulings, issued in the few months since *ACA International* was decided, demonstrate the risk of disparate interpretations of the TCPA in the absence of clear guidance from the FCC. Some courts have held that *ACA International* rejected the prior FCC orders and that random or sequential number generation is thus a requirement, others have ruled that *ACA International* left the prior FCC orders intact, meaning predictive dialers, which did not necessarily randomly or sequentially dial numbers, are autodialers, and still other courts have found the prior FCC orders void, but that systems are not required to randomly or sequentially dial numbers to be considered an ATDS. Compounding this confusion is the issue of human intervention and courts' varying standards for what level of human intervention is required to take a system out of the ATDS definition. Now that the FCC is about to act, a stay is appropriate under the primary jurisdiction doctrine to provide this Court with clarity and to avoid adding to the confusion.

### E. AUTHORITY AND ARGUMENT

#### 1. The Court Has the Inherent Power to Issue a Stay.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In determining whether to grant a stay, courts generally examine whether a stay will unduly prejudice or tactically disadvantage the non-moving party; whether a stay will simplify the issues and streamline the trial; and whether a stay will reduce the burden of litigation on the parties and on the court. *See Coatney v. Synchrony Bank*, No. 616CV389ORL22TBS, 2016 WL 4506315, at *1 (M.D. Fla. Aug. 2, 2016). The specific factors relevant to whether a stay should issue under the primary jurisdiction doctrine are set forth below.

#### 2. A Stay is Warranted Under the Primary Jurisdiction Doctrine

Under the primary jurisdiction doctrine, "a court . . . may stay an action pending resolution of an issue that falls within the special competence of an administrative agency." *Beach TV Cable Co. v. Comcast of Florida/Georgia, LLC*, 808 F.3d 1284, 1288 (11th Cir. 2015). It applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *Boyes v. Shell Oil Prods*. Co., 199 F.3d 1260, 1265 (11th Cir. 2000).

The Eleventh Circuit explained the primary jurisdiction doctrine as follows:

Primary jurisdiction is a judicially created doctrine whereby a court of competent jurisdiction may dismiss or stay an action pending a resolution of some portion of the actions by an administrative agency. Even though the court is authorized to adjudicate the claim before it, the primary jurisdiction doctrine comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an

administrative body; in such a case the judicial process is suspended pending

referral of such issues to the administrative body for its views.

*Smith v. GTE Corp.*, 236 F.3d 1292, 1298 n.3 (11th Cir. 2001) (internal citations omitted). There

are two main justifications for the rule: (1) the expertise of the agency deferred to; and (2) the

need for uniform interpretation of a statute or regulation. *Boyes*, 199 F.3d at 1265. Accordingly,

courts invoke the primary jurisdiction doctrine "to advance regulatory uniformity," "to answer a

question . . . within the agency's discretion," and "to benefit from technical or policy considerations

within the agency's . . . expertise." *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th

Cir. 2010) (internal quotations omitted).

Courts in this Circuit have identified four factors that are "uniformly present in cases where

the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by

Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant

to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4)

requires expertise or uniformity in administration." *Bondhus v. Henry Schein, Inc.*, No. 14-22982-

CIV, 2015 WL 1968841, at *2 (S.D. Fla. Apr. 30, 2015) (internal quotations omitted). Application

of these factors to the instant case counsel squarely in favor of a stay.

### 3. The FCC Will Decide a Dispositive Issue in the Present Case.

A sufficient need to resolve an issue exists where the agency decision will have a significant

effect on the case. *See, e.g.*, *Comprehensive Health Care Sys. of Palm Beaches, Inc. v. M3 USA

Corp.*, No. 16-CV-80967, 2017 WL 4868185, at *2 (S.D. Fla. Oct. 6, 2017) ("CHCS"). This factor

is satisfied if the agency decision could alter the scope of a class, impact motions before the court,

or affect a dispositive issue. *Id.* Under the Hobbs Act, this Court is bound by the FCC's orders,

which are final and controlling.  *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1119 (11th Cir. 2014).[11]

As discussed above, the FCC's Request for Comment makes plain that it intends to rule on issues related the ATDS definition that are at issue in the present case.  Credit Control contends no ATDS was used to contact Plaintiff.  Plaintiff, however, will surely contest this position.  Although the weight of relevant case law supports a narrow ATDS definition in light of *ACA International*, the FCC's forthcoming guidance will speak squarely to issues that are key to resolving this dispute.  For example, in its Request for Comment, the FCC asked, "How 'automatic' must dialing be for equipment to qualify as an automatic telephone dialing system?  Does the word 'automatic' envision non-manual dialing of telephone numbers?  Must such a system dial numbers without human intervention?"  Request for Comment at 2.  Regarding the requirement that an ATDS must "produce telephone numbers to be called, suing a random or sequential number generator," the FCC asked:  "If equipment cannot itself dial random or sequential numbers, can that equipment be an automatic telephone dialing system?"  *Id.* at 2–3. These fundamental questions regarding what constitutes an autodialer will, without a doubt, be contested issues in this litigation.

### 4. The Relevant Issues the FCC's Request for Comment Raises Were Placed Squarely within the FCC's Jurisdiction to Administer and Interpret the TCPA.

---

[11] Indeed, the Hobbs Act's procedural scheme is specifically designed to create uniform interpretation of technical issues requiring agency expertise.  Section 402(a) of the Communications Act provides that (except in limited circumstances not relevant here) any "proceeding to enjoin, set aside, annul, or suspend any order of the Commission" must be brought under the Hobbs Act.  47 U.S.C. § 402(a).  The Hobbs Act, in turn, expressly confers on the federal courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" such FCC orders.  28 U.S.C. § 2342.  "This procedural path created by the command of Congress 'promotes judicial efficiency, vests an appellate panel rather than a single district judge with the power of agency review, and allows 'uniform, nationwide interpretation of the federal statute by the centralized expert agency created by Congress' to enforce the TCPA.'"  *Mais*, 768 F.3d at 1119 (quoting *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 450 (7th Cir.2010)).  On November 13, 2018, the Supreme Court granted certiorari in a TCPA case to determine the scope of judicial deference to the FCC rules under the Hobbs Act. *See* Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC, 883 F.3d 459, 469 (4th Cir. 2018).

There is no debate regarding the FCC's authority to determine the definition of an autodialer. Congress explicitly tasked the FCC with "prescribe[ing] regulations to implement the requirements" of the TCPA. *Bondhus*, 2015 WL 1968841, at *3 (quoting 47 U.S.C. § 227(b)(2) and finding this factor satisfied in granting partial stay under primary jurisdiction doctrine). The FCC's authority also "includes issuing rules clarifying and interpreting the TCPA, as well as addressing petitions." *CHCS*, 2017 WL 4868185, at *6.

The second primary jurisdiction factor is satisfied and counsels in favor of a stay.

### 5. The TCPA and the FCC's Regulations Create a Comprehensive Regulatory Scheme Governing the Regulation of Autodialed Calls to Cellular Telephones.

The third primary jurisdiction factor focuses on the existence of a comprehensive regulatory scheme. The FCC has regulatory authority that subjects the "industry to a comprehensive regulatory scheme that requires expertise or uniformity in administration." *Gusman v. Comcast Corp.*, No. 13CV1049-GPC DHB, 2014 WL 2115472, at *3 (S.D. Cal. May 21, 2014); *see also CHCS*, 2017 WL 4868185, at *2; *Bondhus*, 2015 WL 1968841, at *3. This factor is satisfied and weighs in favor of a stay.

### 6. The Determination of What Types of Systems Constitute Autodialers Requires Both the FCC's Expertise and Uniformity in Administration.

The fourth primary jurisdiction factor focuses on whether a court can benefit from technical or policy considerations within the agency's expertise. This factor is unquestionably satisfied. *See, e.g.*, *CHCS*, 2017 WL 4868185, at *7 ("The FCC is charged with expertise in telecommunications regulation . . . ."); *see also Stewart v. T-Mobile USA, Inc.*, No. 4:14-CV-02086-PMD, 2014 WL 12614418, at *3 (D.S.C. Oct. 8, 2014) ("It is virtually without dispute that the FCC has comparative expertise with regard to the TCPA."). Invoking that expertise is particularly appropriate here, where there is substantial confusion and disagreement over the technical elements of an autodialer under the TCPA.

As to the uniformity of administration, if this case proceeds, there is a risk that the Court could reach a determination that is inconsistent with the FCC's ultimate decision on the definition of an autodialer. In just the few months since *ACA International*, and in the absence of FCC guidance, courts have already issued inconsistent rulings. Giving time for the FCC to decide how the system at issue in this case is to be treated under the statute will "ensure even application of the TCPA . . . ." *Bondhus*, 2015 WL 1968841, at *9.

Each of the four primary jurisdiction factors are easily satisfied in the present case, counseling strongly in favor of a stay.

**7. *Scoma* Rejected All of the Reasons Plaintiff Might Raise in Objection to a Stay.**

In *Scoma,* Judge Steele stayed a junk fax case pending the FCC's action on a rulemaking petition asking "the FCC to examine the state of facsimile technology today and issue a declaratory ruling that the TCPA does not apply to faxes sent or received digitally via an online facsimile service, or on a device other than a telephone facsimile machine." 2018 WL 2455301, at *3. After analyzing and applying the primary jurisdiction doctrine, the court granted a stay, and in doing so, rejected the arguments that Plaintiff will likely raise against a stay in this case.

First, the court rejected the argument that a stay would be futile because any action taken by the FCC would not have retroactive effect. *Id.* at *4. The court held that the argument was "premature and does not affect this Court's analysis as to whether a stay is appropriate now. Whether the FCC's decision has retroactive or prospective effect depends on whether the FCC's decision is rulemaking or a clarification (or both), with a lens towards manifest injustice." *Id.* (citing *Qwest Services Corp. v. FCC*, 509 F.3d 531, 535–39 (D.C. Cir. 2007)).

Second, the court found that "[a]ny delay plaintiffs will experience in this case is outweighed by the potential prejudice that could inure to MasterCard and its liability to class

members that might very well not fit within the proposed class following the FCC's decision." *Id.*
The same calculus applies here. Plaintiff alleges he received approximately 50 calls from Credit
Control that were made with an ATDS, although provided no supporting evidence to the number
of calls or the system used to make the calls. A modest delay to allow the FCC to provide clarity
on this dispositive issue stands only to push out the time when plaintiff may potentially recover
monetarily. On the other side of the ledger, Credit Control is facing substantial liability based on
the TCPA's onerous $500 or $1,500-per-call statutory damages clause. *See* 47 U.S.C. § 227(b)(3).
This substantial liability, however, rests on Plaintiff establishing that Credit control used an
autodialer. On balance, the relative prejudices the parties may suffer weigh strongly in favor of a
stay.

Third, as to the potential length of the stay, the *Scoma* court held that it was "not persuaded
by plaintiffs' argument that a stay of this matter would likely last several years due to the judicial
appeals from any final ruling. . . ." reasoning "that a stay will simplify and streamline the issues
raised in this case and reduce the burden of litigation on the parties and on the Court." *Id.*

Likewise here, the FCC's rapid issuance of its Request for Comment following *ACA
International* indicates the FCC will likely act quickly, though the FCC's action has apparently
been delayed by the recent government shutdown. Given that the composition of the FCC has
changed since the 2015 Order, it is exceedingly likely that the FCC will narrow and clarify the
definition of an autodialer. Chairman Pai and Commissioner O'Reilly dissented vehemently to the
2015 Order that was overturned in *ACA International*, and the D.C. Circuit favorably cited their
dissents in its decision. *ACA Int'l*, 885 F.3d at 697, 702, 704. Those dissenting statements (and
other official statements issued by Chairman Pai and Commissioner O'Reilly) evidence an
approach to the TCPA that is disapproving of broad interpretations. *See, e.g.*, 2015 Order, at 8074
(Comm'r Pai dissenting) (noting that the 2015 Order "dramatically expands the TCPA's reach," is

"flatly inconsistent with the TCPA"); *see also, id.* at 8087 (Comm'r O'Reilly dissenting) (calling the 2015 Order "unfathomable" in how it "further expands the scope of the TCPA"). Chairman Pai and Commissioner O'Reilly also issued statements following *ACA International* expressing their approval of the relevant portions of that decision. Commissioner Carr, who became a Commissioner in August of 2017 and was formerly a legal advisor to Chairman Pai, also issued a statement approving of the decision in *ACA International*, stating that "the prior FCC exceeded the scope of the TCPA and reached a decision of eye-popping sweep … "[12] Given the views of the current leadership of the FCC, and the Commission's rapid action in setting a notice and comment period so soon after *ACA International*, the Commission will almost surely act quickly to clarify the definition of an autodialer and narrow the definition to more closely align with the statute's plain language.

Not only is the FCC's ruling likely to come soon, as Judge Steele reasoned in *Scoma*, it "will simplify and streamline the issues raised in this case and reduce the burden of litigation on the parties and on the Court." 2018 WL 2455301, at *4. If this case is to proceed, the Court and the parties must grapple with the current, unclear, ATDS definition— an exercise that will surely require significant resources. These significant resources will be totally wasted as soon as the FCC issues its ruling and clarifies the ATDS definition, which is likely why Judge Rosenberg in *Buhr* issued a stay until the FCC clarifies the ATDS definition. Accordingly, a modest delay is in the interest of both parties and the Court.

---

[12] Available at https://docs.fcc.gov/public/attachments/DOC-349769A1.pdf. (internal quotations omitted).

## V.    CONCLUSION

For all the foregoing reasons, Credit Control respectfully requests that a stay be granted pending the FCC's clarification of the ATDS definition.[13]

July 12, 2019

Respectfully Submitted,

WATTS LAW GROUP, LLC

*Attorneys for Defendant*
Credit Control, LLC

By:/s/ Patrick A. Watts
Patrick A. Watts, Esq.
150 S. Wacker Dr., Suite 2400
Chicago, Illinois 60606
Ph: (312) 741-0990
Email: pwatts@swattslaw.com

---

[13] Even though Plaintiff will suffer no harm from Credit Control's requested temporary stay, if the Court is concerned about an indefinite stay, Credit Control suggests that—as Judge Rosenberg did in *Buhr*—the Court order the parties to submit a status report to the Court in five months in the event the FCC has not ruled by that time, which will allow the Court to revisit the issue of a stay.

## CERTIFICATE OF SERVICE

### (electronic filing)

**I HEREBY CERTIFY** that on July 12, 2019, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system which will send notification of such filing to the following counsel of record:

Alexander J. Taylor, Esq.
Marwan R. Daher, Esq.
Omar T. Sulaiman, Esq.
Sulaiman Law Group, Ltd
2500 S Highland Ave, Suite 200
Lombard, IL 60148
Telephone: (630) 575-8181
ataylor@sulaimanlaw.com
mdaher@sulaimanlaw.com
osulaiman@sulaimanlaw.com

*Attorneys for Plaintiff*

/s/ Patrick A. Watts