# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANUP PARMAR,<br><br>PLAINTIFF,<br><br>v.<br><br>CREDIT CONTROL, LLC<br><br>DEFENDANT. | Case No.: 1:19-cv-00387<br><br>Judge Rebecca Pallmeyer |

## DEFENDANT CREDIT CONTROL, LLC's MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, Credit Control, LLC ("Credit Control") by and through its undersigned counsel, submits this Memorandum of Law in support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(a).

## I.     INTRODUCTION

### A.  Preliminary Statement

The plain language of the Fair Debt Collection Practices Act excludes from its coverage Credit Control's activities in this case with respect to Plaintiff's Account, as the Account was not in default at the time of assignment from First Bankcard, a division of First National Bank of Omaha ("FNBO"), to Credit Control on November 17, 2018. 15 U.S.C. §1692a6. Credit Control did not treat the account as if it was in default during its collection efforts or otherwise state that the account was in default. Plaintiff knew the account was not in default at the time of Credit Control's activities per his testimony. Also, Credit Control's employees were acting under the control and in the name of FNBO, and were accordingly de facto employees of FNBO, qualifying Credit Control for a second exception to the definition of debt collector under the FDCPA. 15

1

U.S.C. §1692a6(A). Credit Control was operating as an extension of FNBO for the limited purpose of servicing minimum payments due on the Account (not to collect the full balance on the Account) in order to cure Plaintiff's open revolving Account at a time when the Account remained open with FNBO. All other ongoing servicing activities were the responsibility of FNBO during Credit Control's involvement during the period November 17, 2018 to January 8, 2019.

Plaintiff testified in his deposition that he agrees that his credit card account with FNBO was not in default on November 17, 2018, the date it was assigned to Credit Control. Plaintiff also testified that the account was not in default as late as December 11, 2018, the time of the phone call giving rise to Plaintiff's allegations. Plaintiff spoke with Credit Control about the minimum payment due on each of these occasions. FNBO, the originating creditor, agrees that credit card account was not in default on the date the past due minimum payment amounts were assigned to Credit Control and thereafter. The purpose of Credit Control's activities were to cure the minimum payments missed as an extension of FNBO while FNBO continued to maintain and service all other aspects of the open Account. In essence, Credit Control's job was to assist FNBO as a servicer in curing the past due minimum payment on the account to prevent the Account from going into default – not to at as a third party debt collector on a defaulted account.

The only person who believes that the Account was in default at the time of assignment and/or Credit Control's activities - between November 17, 2018 (date of assignment) and January 7, 2019 (date of recall from Credit Control) - is Plaintiff's counsel. Plaintiff's counsel's position is that any past due amount makes the Account in default. Plaintiff's counsel will attempt to conflate the phrases "past due" and "not current" with "default" – a position that has been rejected all courts addressing the meaning of the definition of "default" under the FDCPA.

But the simple reality is that the Account remained open, the Account balance was not accelerated or due, and the credit relationship remained with Plaintiff and FNBO while Credit Control was attempting to collect the minimum payment on the Account only during a limited period of time, starting less than two weeks after the first minimum payment was missed. Plaintiff's counsel will likely take an extremely counterintuitive position and argue that his client's debt went into default prior to November 17, 2018 - months before the creditor, FNBO, considered the account in default - an argument which would cause a plethora of negative consequences for Plaintiff, his Account and consumers in general (acceleration, revocation of credit ect., charge off, adverse future credit decisions.). The minimum payment balance was assigned to Credit Control on the 13th day after Plaintiff had failed to make a $28.00 minimum payment on an Account balance of $956.16 (November 17, 2018). Credit Control was never assigned or attempted to collect the Account balance – only the minimum payments while the Account remained open and the Account balance unaccelerated/not due. The assignment was recalled from Credit Control by FNBO on January 8, 2019, on or about the same date that FNBO terminated the credit line on the Account, revoking credit privileges. The industry refers to this work as "First Party", where a company like Credit Control operates, in the name of, and as an extension of the creditor in servicing an active and open account prior to default.

B.  **Background**

On or about April 21, 2010, Plaintiff opened a New York Life Visa credit card with First Bank, a division of First National Bank of Omaha ("FNBO"), account ending in 2142 (the "Account"). Exhibit A, ¶ 8 (FNBO Dec.). Four times between January 2017 and November 2018, Plaintiff missed a payment and FNBO assigned the Account to Credit Control to cure the past due balance, while FNBO maintained its credit relationship with Plaintiff on the open Account. Exhibit A, ¶ 9 (FNBO Dec.). On each occasion, except for the last, Plaintiff cured the

3

past due amount and FNBO recalled the account from Credit Control. Exhibit A, ¶ 10 (FNBO Dec.). On November 4, 2018, Plaintiff missed a minimum payment on the Account, and on November 17, 2018, the minimum payment balance of $76.00 was assigned to Credit Control. Exhibit A ¶19 (FNBO Dec.). The full balance on the Account was never accelerated by FNBO or due during the time the account was placed with Credit Control and the account remained open. Exhibit A ¶ 27 (FNBO Dec.). Plaintiff's Second Amended Complaint and its claims (DE 11) surround conduct solely occurring between November 17, 2018 (date of assignment to Credit Control) and January 7, 2019 (date of recall from Credit Control by FNBO). (Doc. 11).

Credit Control's relationship with FNBO was as a First Party Servicer. (See Exhibit 2 to Exhibit A, Statement of Work, First Party Collection Services Page 1). Credit Control was acting as "an extension of FNBO". *Id.*

On January 18, 2019, Plaintiff filed a cause of action against Credit Control alleging violations of the Fair Debt Collection Practices Act ("FDCPA") pursuant to 15 U.S.C. §1692, violations of the Telephone Consumer Protection Act ("TCPA") pursuant to 47 U.S.C. §227, Invasion of Privacy ("IOP"), Intentional Infliction of Emotional Distress ("IIED"), and Trespass to Chattels ("TTC"). (DE 1). Prior to Credit Control answering the initial complaint, on February 22, 2019 Plaintiff filed his first amended complaint (the "Complaint") alleging violations of the Fair Debt Collection Practices Act ("FDCPA") pursuant to 15 U.S.C. §1692, violations of the Telephone Consumer Protection Act ("TCPA") pursuant to 47 U.S.C. §227, and violations of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") pursuant to 815 ILCS 505/1 et seq. (DE 11).

Plaintiff's Complaint alleges he began receiving phone calls on his cellular phone related to a credit card debt owed to First National Bank of Omaha. (See Doc. 11 ¶¶ 8, 10). Plaintiff

generally alleges that he defaulted on the underlying account in or around November 2018. (See Doc. 11 ¶¶ 9 and 10).

Despite alleging in the Second Amended Complaint that he instructed Credit Control to stop calling him, forming the basis for his FDCPA claims (Doc. 11 ¶¶ 12-14.), Plaintiff admits in his deposition testimony that he did not request phone calls to stop in the only relevant call with Credit Control on December 11, 2018. Exhibit B (Parmar Deposition), Page 31, lns 21 – Page 32, lns 1-2.

On March 8, 2019, Credit Control filed its answer and affirmative defenses to Plaintiff's Complaint. (DE 15).

On July 12, 2019, Credit Control filed a Motion for Judgment on the Pleadings. (DE 23). On July 19, 2019, Credit Control filed an amended answer to Plaintiff's Complaint. (DE 30). On August 20, 2019, Plaintiff filed his response and opposition to Credit Control Motion for Judgment on the Pleadings and voluntarily withdrew with prejudice Count II and III of the Complaint which alleged violations of the Telephone Consumer Protection Act ("TCPA"), and the Illinois Consumer Fraud Deceptive Practices Act ("ICFA"). (DE 36). On September 5, 2019, the Court denied Credit Control's Motion for Judgment on the Pleadings with respect to Count I of the Complaint. (DE 38). This case proceeds on Count I only.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most

favorable to, and all reasonable inferences from that evidence must be drawn in favor of, the nonmoving party [but] only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary") (citation omitted). After "a properly supported motion for summary judgment is made, the adverse party must "go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); see also *Modrowski,* 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (e.g., produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

### III. ARGUMENT

**A. Credit Control Must Be Granted Summary Judgment Because It Was Acting as a First Party Servicer on an Active Account and Its Activities Are Excluded From the Definition of a Debt Collector As Defined By The FDCPA.**

The FDCPA only applies to "debt collectors" as defined by the statute in § 1692a(6). *Ruth v. Triumph P'ships*, 577 F.3d 790, 796 (7th Cir. 2009). A plaintiff bringing a claim under the FDCPA has the burden of establishing a defendant meets a statutory definition of a debt collector

under § 1692a(6) to succeed on a FDCPA claim. *Heller v. Graf*, 488 F. Supp. 2d 686, 692 (N.D. Ill. 2007). The FDCPA defines a "debt collector" as:

> **"[1] any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or [2] who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."**

See 15 U.S.C. § 1692a(6).

**EXCEPT**, the definition excludes six categories of persons from the definition of a debt collector under the FDCPA, *See* § 1692a(6)(A)–(F). Pursuant to §1692a(6), the term "debt collector" "does **NOT** include:

> **(A) "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor."**

OR

> **(F) "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person . . ."**

> *a. Credit Control was operating as a first party servicer and extension of FNBO to help cure a missed minimum payment on an active and open account being managed by FNBO – it did not receive assignment of a defaulted debt.*

First, whether an entity is subject to the FDCPA as a debt collector depends on the default status of the debt at the time it was obtained. *Alibrandi v. Fin. Outsourcing Servs.*, 333 F.3d 82, 86 (2d Cir. 2003); *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7thCir. 2003) (The FDCPA "treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee, and as creditors if it was not."); *McClenahan v. Equifax Info. Servs. LLC*, No. 14-cv-507 (DWF/FLN), 2016 WL 554819, at *3 (D. Minn. Feb. 11, 2016) ("[A] person who obtained the debt at issue when the debt was not in default cannot be liable as a debt collector under the FDCPA."). Additionally, a defendant is not a debt collector if the defendant is servicing, rather than collecting, the plaintiff's debt. . *See Motley v. Homecomings Fin., LLC*,

7

557 F. Supp. 2d 1005, 1009 (D. Minn. 2008); see also *Schlosser*, 323 F.3d at 538 ("For those who acquire debts originated by others, the distinction drawn by the statute—whether the loan was in default at the time of the assignment—makes sense as an indication of whether the activity directed at the consumer will be servicing or collection.").

As noted by the 6th Circuit,

> "The distinction between a creditor and a debt collector lies precisely in the language of § 1692a(6)(F)(iii). For an entity that did not originate the debt in question but acquired it and attempts to collect on it, that entity is either a creditor or a debt collector depending on the default status of the debt at the time it was acquired. The same is true of a loan servicer, which can either stand in the shoes of a creditor or become a debt collector, depending on whether the debt was assigned for servicing before the default or alleged default occurred."

*Bridge v. Ocwen Fed. Bank*, 681 F.3d 355, 362 (6th Cir. 2012).

The FDCPA does not define default or specifically address when a debt is in default but the 7th Circuit has provided guidance on this issue. *See Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7thCir. 2003) ("the Act treats assignees as debt collectors if the debt sought to be collected was in default when acquired by the assignee, and as creditors if it was not"). In *Schlosser*, the defendant was a second hand purchaser of plaintiff's mortgage. *Id.* The defendant issued a demand letter to the plaintiff stating "This letter constitutes formal notice of **default** under the terms of the Note . . . ." *Id.* at 535 (emphasis added). Plaintiffs in *Schlosser* sued alleging violations of the FDCPA for failing to include in the collection correspondence that they had a right to contest the debt (mandate of the FDCPA). *Id.* at 535. Defendant Fairbanks Capital argued that the mortgage/debt actually was not in default when it issued the letter or when it was assigned to it. *Id.* Fairbanks argued that it was mistaken when it issued the default letter and the debt/mortgage actually was not in default and accordingly it was not a "Debt Collector" under §1692a(6). *Id.* at 536. The 7th Circuit rejected defendant's argument, and instead found that the exclusion of §1692a(6)(F)(iii) does not apply because "Fairbanks attempted to collect on a debt

that it **asserted** to be in defaulted and because that it **asserted** default existed when Fairbanks acquired the debt". *Id.* at 539 (emphasis added).

In this case, and unlike in *Schlosser,* at no point did Credit Control assert that the debt was in "default" – the dispositive issue presented in *Schlosser. Id.*; Exhibit C, ¶ 4(Pirotta Dec.). In fact, the ongoing monthly account statements received by Plaintiff from FNBO during November 2018 demonstrate that the Account remained active and open with FNBO with available credit after assignment of the minimum payment due to Credit Control on November 17, 2018 – reflecting the $76.00 minimum payment assigned to Credit Control as "due" on December 4, 2018. Exhibit A. ¶ 16-17; Exhibit 1 to Exhibit A, Page 89. (November Account Statement). At no point did Credit Control state to Plaintiff during any communication that the Account was in default and Credit Control never attempted to collect the balance on the Account. Exhibit C ¶ 4-5 (Pirotta Dec.). In *Schlosser*, the court also noted that when a loan is in default, no ongoing servicing relationship is likely [between the original creditor and debtor], but in the case of a loan servicer/non-debt collector, such ongoing relationship is likely. *Schlosser*, 323 F.3d at 538. Here, Credit Control was collecting in the name of FNBO, Plaintiff maintained an open an available credit line with FNBO, and FNBO continued to issue statements to Plaintiff and otherwise service the Account. See Exhibit A (FNBO Dec.). Credit Control was only attempting to cure the minimum payment due on the Account per the November statement and as soon as the credit line was revoked by FNBO on or about January 7, 2019, FNBO recalled the account from Credit Control. See Exhibit A, ¶ 24. (FNBO Dec.). Here, Credit Control was simply acting as an extension of FNBO and in the name of FNBO for purposes of curing minimum payments due on an open and non-defaulted revolving credit account. Exhibit 1 to Exhibit A, Page 1-2 (Statement of Work First Party Collection Services). In the instant matter, the Account was assigned to Credit Control by FNBO pursuant to a First Party Collection

Services agreement. Exhibit 2 to Exhibit A, Pg. 1-2 (Statement of Work First Party Collection Services). Pursuant to the First Party Agreement and in the relevant part, i) the parties agreed that **past due** accounts may be referred to Credit Control for first party collection services, ii) Credit Control and its employees shall act in all respects as an extension of FNBO's internal billing and collection departments and its conduct and activities shall be governed accordingly by FNBO, iii) Credit Control agreed to handle customer calls for FNBO in accordance with the First Party Agreement, FNBO's training materials, and FNBO's policies, procedures, and instructions, iv) Credit Control will adhere to FNBO's standards on call limits and voicemail messages, v) Credit Control shall perform its services in the name of FNBO, or its affiliates, vi) Credit Control shall provide dedicated employees exclusively for performing the services under the First Party Agreement and shall not perform services for any other client or project of Credit Control, and vii) Credit Control shall participate in weekly conference calls with FNBO to review it performance against the expectations of FNBO. Exhibit 2 to Exhibit A (Statement of Work First Party Collection Services) (Emphasis Added).

In other words, by working as an extension of FNBO during FNBO's maintenance of an active and open non-defaulted account, Credit Control maintained the exact type of servicing relationship with FNBO and Plaintiff referred to by the 7th Circuit in Schlosser that distinguishes Credit Control from the post default debt collector. *See Schlosser*, 323 F.3d at 536 (equating debt servicers with "creditors" as opposed to "debt collectors" under the FDCPA).

Further, Plaintiff's counsel is expected to conflate the terms "past due" or "non-current" with the term "default" under the FDCPA §1692a(6)(F)(iii). This simplistic approach has been expressly rejected by at least one other Circuit. Generally, a debt does not go into default at its inception or immediately after payment first becomes due. *Alibrandi*, 333 F.3d at 86-87 (2d Cir. 2003). In *Alibrandi*, the Second Circuit held that default does not occur immediately, but rather

at some point after the debt is outstanding or delinquent. 333 F.3d at 87. The court reasoned that it would not serve the FDCPA's broad, pro-debtor purpose if a debt went into default immediately after payment becomes due because of the adverse consequences that default imposes on debtors—such as acceleration, repossession, increased interest rates, and negative credit reports. *Id*. Therefore, there must be some period of time after a debt becomes due and is outstanding before it is "in default." *Id*. at 86–87. The Court in *Alibrandi,* in rejecting the plaintiff's argument that a debt goes into default "as soon as it is due", cited a number of federal and state regulations indicating that certain types of debts do not go into "default" for specified periods of time" as an example for the notion that debts do not go into default immediately upon becoming "past due". *Id. (citing Jones v. Intuition, Inc.,* 12 F.Supp.2d 775, 779 (W.D.Tenn. 1998) ("Prior to the default period, the unpaid loan installment is considered delinquent.")"

- Student Loans payable in monthly installments go into default 180 days after delinquency as defined by FFELP;

The Second Circuit in *Alibrani* noted:

Likewise, various other federal regulations have defined default as commencing anywhere between thirty and 270 days after a debt becomes due. See, e.g., 7 C.F.R. § 762.141(a) (1999) (30 days for farm loans); 12 C.F.R. § 336.3(c) (1999) (90 days for loans by federal insured depository institutions to Federal Deposit Insurance Corporation employees); 34 C.F.R. § 685.102(b) (1999) (270 days for certain student loans). Although these judicial decisions and regulations reflect inconsistent periods of time preceding default, they all agree that default does not occur until well after a debt becomes outstanding.

Here, no one other than Plaintiff's attorney believes the Account was in default on November 17, 2018 – the date of assignment to Credit Control. Plaintiff's last payment was made on September 17, 2018 in the amount of $1,000.00 and the account was fully current at this time. Exhibit A, ¶ 11; Exhibit 1 to Exhibit A (FNBO Dec.), at Page 73). On or about October 9, 2019, FNBO sent Plaintiff a monthly statement which indicated a credit line of $2,000.00, a total

balance of $917.23, available credit of $1,082.00, and a minimum payment due of $28.00 with a due date of November 4, 2019. Exhibit A, ¶ 12 (FNBO Dec.), Exhibit 1 to Exhibit A at Page 73). Plaintiff missed the minimum payment due on or before November 4, 2019. Exhibit A, ¶ 14 (FNBO Dec.). On or about November 6, 2019, FNBO sent Plaintiff another monthly statement which indicated a credit line of $2,000.00, a total balance of $956.16, available credit of $1,043.00, and a minimum payment due of $76.00 with a due date of December 4, 2019. Exhibit A, ¶ 16 (FNBO Dec.). Eleven days later, on November 17, 2018, FNBO assigned the $76.00 minimum payment balance (reflected as "minimum payment due" on **December 4, 2019** per statement issued November 6, 2018) to Credit Control to collect and cure the missed payment. Exhibit A (Dec. FNBO); Exhibit 1 to Exhibit A, Page 73).

On November 17, 2019, FNBO did not consider Plaintiff's Account in default and Plaintiff's Account was open with available credit. Exhibit A, ¶ 20. Per his deposition testimony, in discussing the November 17, 2018 call from Credit Control shortly after assignment, Plaintiff did not consider the Account to be in default on the date the past due balance was assigned to Credit Control by FNBO:

> **Q: "So we listened to the November 17, 2018 call. First of all is that your voice in the recording?**
> **A.     Yes"**

Exhibit B (Parmar Deposition Page 28 Lns, 6-9).

> **Q: "Did you consider the card to be in default at the time of the phone call that we just listened to?**
> **A: No.**
> **Q. Okay. When I say card, you understand I mean the card, the credit account, the revolving credit account?**
> **A. Right."**

Exhibit B (Parmar Deposition Page 29 Lns, 19-22; Page 30, 1-2).

> **Q.     "Did you at this time on December 11, 2018, did you consider your New York Life Visa issued by First Bank, did you consider that account to be in default?"**

**A. I don't believe – No, I don think so.**

Exhibit B (Parmar Deposition Page 31, lns 9-14).

Credit Control only spoke with Plaintiff twice after assignment – once on November 17, 2018 and once on December 11, 2018. Exhibit C ¶ 6 (Pirotta Dec.). Both conversations were recorded and listened to during Plaintiff's deposition (referenced above). Exhibit C ¶ 6 (Pirotta Dec.). Per his testimony, Plaintiff believed the Account would remain open if he paid the minimum due. Exhibit B, Pgs. 28-29, Lines 21-2 (Parmar Deposition). At no point did Credit Control attempt to collect the total balance on the Account as only the past due minimum payments had been assigned to Credit Control for the purposes of curing the past due amounts. Exhibit C, ¶ 5 (Pirotta Dec.). On or about December 6, 2019, FNBO sent Plaintiff another monthly statement which indicated a credit line of $2,000.00, a total balance of $1,007.64, and a minimum payment due of $137.00 with a due date of January 4, 2019. Exhibit A, ¶ 23 (FNBO Dec.).

Not only was Plaintiff's Account not in default at the time of assignment, the Account was not in default during any time the past due balance was assigned to Credit Control Exhibit A, ¶ 25. The sole purpose of FNBO's assignment of the past due minimum payment amount to Credit Control was for Credit Control to attempt to cure the delinquencies – and to avoid a default on the Account. Exhibit A, ¶ 22 (FNBO Dec.).

Credit Control's assistance with the collection of a minimum payment due of a non-defaulted account/balance that remained open and active as an extension of FNBO's other servicing activities on the Account cannot rise to the level of receiving "assignment" of a defaulted debt.

For the foregoing reasons, Credit Control should be granted summary judgment as to Plaintiff's FDCPA claims because the Account was not in default at the time it was assigned to

13

Credit Control to cure the past due balance and Plaintiff failed to meet his burden that Credit Control was acting as a debt collector with respect to Plaintiff's Account.

### b. *De Facto Employee Exception to Definition of Debt Collector.*

The FDCPA exempts from the definition of "debt collector" "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor." § 1692a(6)(A). The Fair Trade Commission ("FTC") Staff Commentary on the FDCPA, 53 Fed. Reg. 50,097 (1988), stated that this exemption "includes a collection agency employee who works for a creditor to collect in the creditor's name at the creditor's office under the creditor's supervision because he has become the de facto employee of the creditor." *Id*. at 50,102, Comment 803(6)-4(a). This interpretation was subsequently broadened to include employees that do not work on the creditor's premises, provided the creditor maintains an "extensive degree of control" over the employees' collection activities. Shapiro FTC Informal Staff Opinion Letter (October 1, 1997).

The FTC, in its de Mayo Letter, explained because § 1692a(6)(A) exempts only a creditor's "officers" and "employees," the de facto exemption does not extend to the creditor's representatives or agents and applies only "to those collection agency employees who are treated essentially the same as creditor employees." See Letter from Thomas E. Kane, Attorney, Division of Financial Practices, FTC, to Richard T. de Mayo, Esq. (May 23, 2002), at 2-3. The FTC further explained:

> *The more that agency employees are treated like creditor employees, the more likely it is that we would deem them de facto employees. Whether agency employees -- working on the creditor's premises or on the agency's premises -- are treated enough like creditor employees to become de facto employees of the creditor will depend on the degree of control and supervision exercised by the creditor over the agency employees' collection activity, and how similar that control and supervision is to that exercised by the creditor over its own employees.*

14

> *Relevant facts will include, for example, whether the creditor directly supervises and monitors the collection activities of the agency employees and, if so, how that supervision and monitoring is carried out; whether the creditor trains the agency employees; and whether the agency employees are subject to the same rules, procedures, and disciplinary actions that govern the collection activities of creditor employees. Id.*

In fact, the CFPB (FTC and CFPB oversee FDCPA) described typical compensation for first-party collectors in the credit card industry as companies that are paid on a full-time employee basis versus a contingency. Meaning an agencies compensation is based on the number of full-time employees used per month in the collection efforts. See Consumer Fin. Protection Bur., The Consumer Credit Card Market 248–249 (Dec. 2015).

In the instant matter, the Account was assigned to Credit Control by FNBO pursuant to a First Party Collection Services agreement, dated September 22, 2016 (the "First Party Agreement"). See Exhibit A; Exhibit 2 to Exhibit A. Pursuant to the First Party Agreement and in the relevant part, i) the parties agreed that **past due** accounts may be referred to Credit Control for first party collection services, ii) Credit Control and its employees shall act in all respects as an extension of FNBO's internal billing and collection departments and its conduct and activities shall be governed accordingly by FNBO, iii) Credit Control agreed to handle customer calls for FNBO in accordance with the First Party Agreement, FNBO's training materials, and FNBO's policies, procedures, and instructions, iv) Credit Control will adhere to FNBO's standards on call limits and voicemail messages, v) Credit Control shall perform its services in the name of FNBO, or its affiliates, vi) Credit Control shall provide dedicated employees exclusively for performing the services under the First Party Agreement and shall not perform services for any other client or project of Credit Control, and vii) Credit Control shall participate in weekly conference calls with FNBO to review it performance against the expectations of FNBO. See Exhibit 2 to Exhibit A. Credit Control identified itself as New York Life Visa Card or Firstbank in all calls with the

Plaintiff. Exhibit C, ¶ 7, (Pirotta Dec.). Credit Control only attempted to cure the minimum payment balance in all calls with Plaintiff. Exhibit C, ¶ 8 (Pirotta Dec.). Credit Control had dedicated representatives for accounts assigned by FNBO pursuant to the First Party Agreement. Exhibit C, ¶ 9, (Pirotta Dec.); Exhibit 2 to Exhibit A (First Party Agreement). Credit Control did not receive any contingency fee/commission for work performed pursuant to the First Party Agreement. Exhibit C, ¶ 10, (Pirotta Dec.).

Credit Control's employees – who were dedicated exclusively to working in the name of, under the control of, at the guidance of, and on behalf of FNBO, on a non-contingency/commission basis - were acting as nothing more than de facto employees of FNBO in conjunction with other contemporaneous servicing efforts of FNBO on an active and open credit account. This First Party servicing work under the supervision and control of the original creditor on an open account was simply never intended to be regulated by FDCPA.

Therefore, for the foregoing reasons, Credit Control should be granted summary judgment as to Plaintiff's FDCPA claim because Credit Control was not acting as a debt collector with respect to Plaintiff's Account.

**B. Plaintiff Parmar Admits in His Deposition Testimony that He did Not Ask Credit Control to Stop Calling Him and Accordingly His FDCPA Claims (COUNT I) Fail.**

Credit Control spoke with Plaintiff only twice after assignment from FNBO – on November 17, 2018, and on December 11, 2018. Exhibit C, ¶ 6, (Pirotta Dec.).

Plaintiff makes no request for Credit Control to cease contacting him in the November 17, 2018 call. Exhibit B, Pg. 28, lns 6-13 (Parmar Deposition).

Plaintiff alleges in the Second Amended Complaint that "Around early December 2018, Plaintiff answered a call from Defendant. During this call Defendant requested that Plaintiff

16

make a payment on the subject debt." De. 11 ¶ 12. Plaintiff's FDCPA claim are based upon the proposition that Plaintiff instructed Credit Control to stop contacting him. See De. 11. Count I.

After listening the entirety of the November 17, 2018 and December 11, 2018 calls during his deposition, Plaintiff stated as follows:

> Q. So we listened to the November 17th, 2018 call. First of all, was that your voice in the recording?
> A. Yes.
> Q. Okay. At any time during that recording did you instruct the company that was calling you to stop calling you?
> A. No.

Exhibit B, Pg. 28, lns 6-13 (Parmar Deposition).

> Q. Mr. Parmar, I'm going to play you a December 11, 2018 recording in connection with your New York Life Visa card or First Bank card. I'm going to ask you to listen to it and I'll have a few questions afterward.

Exhibit B, Page 30, lns 10-14.

> Q. So we just listened to the entirety of the one minute and 15 second phone call. It's complete. At any point during that phone call, did you hear yourself instruct whoever it was calling you to stop calling you?
> A. No, not myself

Exhibit B, Page 31, lns. 21-24; Page 32, Lns 1-2.

Credit Control did not communicate or speak Plaintiff by phone other than on two occasions - during the November 17, 2018 phone call and during the December 11, 2018 phone call – both of which were played in their entirety at Plaintiff's deposition. Exhibit C, ¶ 4 (Pirotta Dec.).

Plaintiff's claim that under 15 U.S.C. §1692c and d in Count I are all based upon the inaccurate representation that Plaintiff asked Credit Control to cease calling him, an assertion which is entirely rebutted by the record and Plaintiff's own deposition testimony. Accordingly, even assuming the Court finds that Credit Control does not fall in the two exceptions to the definition of "debt collector", Plaintiff's claims in Count I fail on the merits.

## IV. CONCLUSION

For all the foregoing reasons, Credit Control respectfully requests that this Court grant its Motion for Summary Judgment and any other relief this Court deems just and proper.

Dated: November 7, 2019

                                      Respectfully submitted,

                                      /s/ PATRICK A. WATTS
                                      Patrick A. Watts
                                      IL State Bar No. 6202112
                                      Watts Law Group, LLC
                                      150 S. Wacker Drive, Ste. 2400
                                      Chicago, IL 60606
                                      P: (312) 725-8267
                                      F: (888) 632-6937
                                      pwatts@swattslaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 7, 2019, the foregoing was filed electronically with the Clerk of the Court and served by operation of the Court's electronic filing system to the following counsel of record:

Omar Tayseer Sulaiman
Alexander James Taylor
Marwan R. Daher
Sulaiman Law Group, Ltd.
2500 S. Highland Avenue
Suite 200
Lombard, IL 60148
(630) 575-8181
osulaiman@sulaimanlaw.com
ataylor@sulaimanlaw.com
mdaher@sulaimanlaw.com

                                                              /s/ Patrick Watts